Argued and submitted December 7, 1998, reversed and remanded in part; otherwise affirmed November 8, 2000

Ronald H. CHECKLEY,
individually and as Guardian Ad Litem for
Shad Alan Wagner,
an incapacitated person,
on behalf of Shad Alan Wagner and Lon N. Bryant,
Guardian Ad Litem for Shad Alan Wagner,
*Appellants,*

*v.*

Charles BOYD
and Bimla Boyd,
husband and wife,
and Keizer Congregation of Jehovah's Witnesses,
Salem, Oregon,
an Oregon non-profit corporation,
*Respondents.*

(95C-12511; CA A96887)

14 P3d 81

Kelly Clark argued the cause and filed the briefs for appellants.

Richard L. King argued the cause for respondents Charles Boyd and Bimla Boyd. With him on the brief was Warren Allen King O'Hara Bennett & Jepsen, LLP.

John E. Pollino argued the cause for respondent Keizer Congregation of Jehovah's Witnesses, Salem, Oregon. With him on the brief were Chess Trethewy and Garrett, Hemann, Robertson, Paulus, Jennings & Comstock, P.C.

Before Landau, Presiding Judge, and Haselton and Linder, Judges.

LINDER, J.

## LINDER, J.

Plaintiff Ronald Checkley, as guardian and on behalf of his disabled brother, Shad Wagner, brought intentional infliction of emotional distress (IIED) claims alleging that defendants Charles and Bimla Boyd (the Boyds) engaged in a pattern of brainwashing, influencing, manipulating, and coercing Wagner. Plaintiff also brought actions on his own behalf for IIED and for wrongful use of civil proceedings. On all counts, plaintiff alleged that the Keizer Congregation of Jehovah's Witnesses (the Congregation) is vicariously liable for the Boyds' conduct because the Boyds were acting under the Congregation's direction and control.[1] The trial court dismissed plaintiff's actions on his own behalf for failure to state a claim. ORCP 21 A(8). The claims brought on Wagner's behalf proceeded to a jury trial, and the trial court directed verdict in defendants' favor at the close of plaintiff's case-in-chief. On appeal, plaintiff raises numerous assignments of error relating to the dismissals, the directed verdict, and various evidentiary rulings. For the reasons that follow, we affirm in part and reverse in part.

■■    We begin by reviewing the trial court's dismissal of the IIED and wrongful use of civil proceedings claims that plaintiff brought on his own behalf. For purposes of reviewing a trial court's order of dismissal pursuant to ORCP 21 A(8), we accept all of the facts alleged in the complaint as true, and we give plaintiff the benefit of all reasonable inferences that may be drawn from the facts alleged. *Glubka v. Long*, 115 Or App 236, 238, 837 P2d 553 (1992).

---

[1] Although the Boyds and the Congregation appear separately in this case, their legal arguments are complementary and, indeed, often address the same points and make the same or similar arguments. Consequently, we generally refer to the Boyds and the Congregation collectively as "defendants." We use individual designations (either "the Boyds" or "the Congregation") only where needed to provide clarity as to the facts.

Likewise, for ease of reference, we refer to plaintiff in the singular, even though Checkley's complaint alleges claims both on his own behalf as well as on behalf of his brother, Wagner. As to the latter, although we describe those claims as brought by Checkley in his capacity as Wagner's guardian, they also are brought by Lon Bryant, who was appointed as Wagner's guardian ad litem between the filing of the second and third amended complaints.

In support of the IIED claims brought on his own behalf, plaintiff alleged that his brother, Wagner, suffers from mental disabilities due to physical injuries resulting from an automobile accident, and he has lived under plaintiff's care since 1981. As a result of his mental disabilities, Wagner is highly vulnerable to suggestion, influence, and coercion. According to plaintiff,

> "[The] Boyds engaged in a deliberate pattern of brainwashing Wagner, and influenced, manipulated and coerced Wagner into thinking that:
>
> "A. [Plaintiff] had stolen money from Wagner over the years and had dealt dishonestly with Wagner in financial matters;
>
> "B. Wagner was being emotionally, spiritually and physically abused by [plaintiff];
>
> "C. Wagner's physical needs were being neglected and that [plaintiff's] care of Wagner was inadequate;
>
> "D. [Plaintiff's] lifestyle and religious beliefs were at odds with Wagner's;
>
> "E. [Plaintiff] was holding Wagner prisoner and persecuting Wagner for his religious beliefs;
>
> "F. [Plaintiff], not being a Jehovah's Witness, and opposing the involvement of Jehovah's Witnesses in Wagner's life, was an instrument of Satan, was under the influence of Satan, or was Satan, and that Wagner's salvation, and spiritual and emotional health was at risk if he continued to live with [plaintiff];
>
> "G. Wagner had a religious and moral duty to attempt to remove [plaintiff] as guardian and conservator."

The complaint further alleged that, at the Boyds' urging, Wagner initiated proceedings to remove plaintiff as his guardian and conservator and that the allegations in support of removal were adjudicated to be without merit. According to the complaint, the Boyds' conduct in that regard was "deliberate and intentional and designed to cause [plaintiff] extreme turmoil and distress," and plaintiff did, in fact, suffer from "extreme and lasting emotional turmoil [and] distress" as a result.

■        In dismissing plaintiff's own claims for IIED against the Boyds and the Congregation, the trial court concluded that plaintiff had failed to state a claim but did not explain in what particular way or ways the court found the complaint to be deficient.[2] To properly plead a claim of IIED, a plaintiff must allege facts sufficient to demonstrate that the defendant: (1) intentionally—*i.e.*, that the defendant intended to cause or knew with substantial certainty that his or her conduct would cause severe emotional distress; (2) engaged in outrageous conduct—*i.e.*, conduct that was an extraordinary transgression of the bounds of socially tolerable behavior; and (3) caused the plaintiff severe emotional distress—*i.e.*, the defendant did in fact cause the plaintiff emotional distress that was severe. *McGanty v. Staudenraus,* 321 Or 532, 543, 550-51, 901 P2d 841 (1995). In this case, we have no difficulty determining that the allegations of plaintiff's complaint, as we have just quoted them, sufficiently pleaded the elements of intent and causation for an IIED claim. The allegations as to the remaining element of "outrageousness," however, warrant discussion.

        As detailed above, the complaint alleges that the Boyds knew that plaintiff's brother, Wagner, was susceptible to suggestion and influence; that the Boyds nonetheless engaged in a pattern of "brainwashing" the brother and "influenced, manipulated and coerced" him to believe that plaintiff was abusing him and was pilfering funds from him; that those accusations were "adjudicated to be without merit"; that the Boyds' conduct was "designed" to cause plaintiff extreme distress; and that the Boyds' motive for that conduct was to remove plaintiff as his brother's guardian. Viewing those allegations and all reasonable inferences they might support in the light most favorable to plaintiff, the complaint can be understood to allege both that the Boyds'

---

[2] Throughout our discussion of the dismissal of the IIED claims, we consider both the dismissal of the IIED claim that plaintiff brought on his behalf against the Boyds as well as the IIED claim that he brought on his behalf against the Congregation on a vicarious liability theory. The trial court dismissed the vicarious liability claim because it concluded that plaintiff had not alleged all elements of the underlying claim against the Boyds for IIED. On appeal, the Congregation argues only that the trial court was correct in deciding that plaintiff had not stated a claim for the underlying tort. Thus, the fate of the IIED claim against the Congregation follows that of the claim against the Boyds.

conduct toward plaintiff was defamatory and that the Boyds knew that their defamatory accusations were unsubstantiated.

We agree with plaintiff that those allegations satisfy the outrageousness element of the tort of IIED. Decisions of both this court and the Oregon Supreme Court consistently have held that a defendant's publication of a defamatory or otherwise significantly stigmatizing statement, knowing the statement to be false, unfounded, or unsubstantiated, is conduct that, if found to be true by a factfinder, constitutes an extraordinary transgression of what is socially tolerable. The earliest of those cases is *Hall v. The May Dept. Stores*, 292 Or 131, 637 P2d 126 (1981). There, the court held that outrageousness was adequately pleaded where the allegations permitted an inference that the defendant-employer knew that it lacked proof that an employee stole store funds and that it nevertheless accused the employee of theft and threatened to have the employee arrested and charged, all as part of a design to coerce the employee into confessing.[3] Since *Hall*, our court consistently has reached the same conclusion on similar allegations or evidence, often emphasizing, as adding to the socially outrageous quality of the conduct, the fact that the defamation allegedly was to serve an ulterior purpose or to take advantage of an unusually vulnerable individual.[4]

---

[3] The court in *McGanty* disapproved of *Hall*, but only insofar as it holds that the parties' relationship affects the intent analysis. *See McGanty*, 321 Or at 549-50.

[4] *See, e.g., Kraemer v. Harding*, 159 Or App 90, 976 P2d 1160, *rev den* 329 Or 357 (1999) (directed verdict properly denied where the defendants accused the plaintiff of sexually molesting schoolchildren under circumstances permitting an inference that the defendants either did not believe or lacked reasonable grounds to believe the charges and were instead trying to force the plaintiff's reassignment); *Dalby v. Sisters of Providence*, 125 Or App 149, 865 P2d 391 (1993) (IIED claim improperly dismissed where complaint supported an inference that the defendant, knowing that it had no basis to believe its employee committed theft, accused the employee of theft and encouraged a police investigation and arrest, all as retribution for the employee's report of the defendant's failure to comply with legal requirements in keeping drug inventory records); *Woods v. First American Title Ins. Co.*, 102 Or App 343, 794 P2d 454, *adhered to on recons* 104 Or App 100, 798 P2d 1121 (1990), *rev den* 311 Or 151 (1991) (dismissal reversed where allegations permitted an inference that the defendant falsely accused the plaintiff of being a liar, a thief, and a fraud, and did so knowing that, due to an illness, such accusations would be particularly distressing to the plaintiff); *McCool v. Hillhaven Corporation*, 97 Or App 536, 777 P2d 1013, *rev den* 308 Or 593 (1989) (dismissal reversed where allegations permitted an inference that the defendant framed the plaintiff for charges of theft and dishonesty).

The allegations of the complaint in this case fit well within those precedents. Plaintiff alleged that the Boyds accused him of pilfering funds from and abusing his brother, Wagner, a mentally disabled person who was especially vulnerable to influence and to whom plaintiff, as Wagner's guardian, owed special fiduciary duties. Such accusations are serious ones that potentially could have led to a formal investigation of plaintiff, OAR 411-020-0040, and ultimately to plaintiff's removal as guardian and conservator, ORS 125.225, in addition to civil liability, ORS 125.485. Indeed, at least in part due to those accusations, Wagner allegedly sought to have plaintiff removed as his guardian. Plaintiff's complaint, read in the light most favorable to plaintiff, permits an inference that the Boyds made those serious accusations against plaintiff either with knowledge that they were false or at least without substantiation. Plaintiff's complaint further alleges that the conduct was designed to prey on the particular vulnerabilities of plaintiff's brother, who suffered from significant mental disabilities due to physical injuries, in order to have the brother seek to remove plaintiff as his guardian. Such an inference falls within the bounds of what we and the Supreme Court consistently have concluded satisfies the "outrageousness" element of IIED.

■ ■ Defendants assert three alternative grounds for affirming the trial court's dismissal. First, defendants argue, as they did below, that plaintiff's claims impinge on their constitutionally protected rights to free exercise of religion.[5] Specifically, according to defendants, all of the conduct and statements that are the focus of plaintiff's allegations were religiously motivated and "inextricably tied to religious beliefs." Thus, defendants contend that plaintiff's claims, if tried, would require an improper inquiry into the validity of their religious beliefs. In renewing their free exercise defense

---

[5] Defendants rely on the First Amendment to the United States Constitution and discuss and cite cases turning on the federal Free Exercise Clause. They also make a bare citation to Article I, sections 2, 3, and 8, of the Oregon Constitution, but they do not independently analyze their claim under the Oregon Constitution. We therefore limit our discussion to the First Amendment and to cases decided under it. *See Christofferson v. Church of Scientology*, 57 Or App 203, 235 n 23, 644 P2d 577, *rev den* 293 Or 456 (1982), *cert den* 103 S Ct 1196, 459 US 1206, 75 L Ed 2d 439 (1983) (similarly limiting discussion to First Amendment, where the defendants failed to distinguish federal and state constitutional analysis).

on appeal, defendants place primary reliance on *Christofferson v. Church of Scientology*, 57 Or App 203, 644 P2d 577, *rev den* 293 Or 456 (1982), *cert den* 103 S Ct 1196, 459 US 1206, 75 L Ed 2d 439 (1983). We agree that our decision in that case provides the analysis we should follow here, and we begin by discussing it in some detail.

The plaintiff in *Christofferson* brought a fraud action against the Church of Scientology, alleging that members of the church induced her to pay for its courses by representing, among other things, that the courses would provide her with knowledge of the mind and that the church's "Dianetics" theory was scientifically provable to cure such ailments as asthma and arthritis. In response to the plaintiff's claim that those representations were false and that the church either knew or should have known that they were false, the church maintained that the representations reflected the church's religious belief system. Thus, according to the church, to determine whether the representations were true or false, a factfinder would necessarily be required to pass on the truth or falsity of the church's religious tenets, which is an inquiry that itself violates the Free Exercise Clause. *See, e.g., United States v. Ballard*, 322 US 78, 64 S Ct 882, 88 L Ed 1148 (1944). Consequently, before trial, the church moved to exclude from the jury's consideration any evidence regarding the validity or sincerity of the church's beliefs and practices. That motion was denied. Later, at the conclusion of the evidence, the church moved to strike and withdraw from the jury all of the allegations related to what the church had asserted throughout the trial constituted the church's religious practices. That motion, too, was denied. *Christofferson*, 57 Or App at 235.

In affirming the trial court on both rulings, we observed that the success of a free exercise defense to a tort claim depends as a threshold matter on whether the conduct or statements on which liability is predicated were in fact religious in nature. Both of the church's motions in *Christofferson* effectively asked the trial court to decide the religious character of the representations and to withdraw that issue from the jury. *Id.* at 237. We held that a trial court may do so only if the religious character of the conduct or statements can be determined as a matter of law—that is, where no other

conclusion can be drawn. Where the allegations or the evidence supports competing conclusions, the jury resolves the issue as it would any other question of fact. *Id.* at 237-38.

In analyzing whether the representations in *Christofferson* were religious as a matter of law, we examined: (1) whether the defendant organization was of a religious nature; (2) whether the claimed misrepresentations related to the organization's religious beliefs and practices; and (3) whether the statements, even if made on behalf of a religious organization and if possessing a religious character, were made for a wholly secular purpose. *Id.* at 241-44. We had little difficulty answering the first two questions affirmatively. As to the third, however, we concluded that a jury question was presented. Although the alleged misrepresentations were made on behalf of a religious organization and had a religious character, they were not of a kind that may only be classified as religious. Moreover, given the evidence, the jury could find that the statements were made for nonreligious reasons. Consequently, the church's pretrial motion properly was denied as premature, and the motion at the end of trial, although it raised the issue at the proper time, was properly denied because evidence at trial created a jury question on whether the representations were made for religious reasons or for wholly secular ones. *Id.* at 235, 244.

■ Relying on *Christofferson*, defendants contend that "evidence" in this case suggests that the Boyds were "religiously motivated" and that there is "no evidence" to support plaintiff's allegations that the Boyds instead were motivated by a desire to inflict severe emotional distress. Those arguments reflect a misunderstanding of our standard of review and of the nature of plaintiff's claims. We are not at liberty to evaluate the "evidence" to which defendants refer because our review of an ORCP 21 A(8) dismissal is limited to an examination of the allegations of plaintiff's complaint. In other words, for defendants to prevail in their efforts to dismiss plaintiff's IIED claims, it must be clear from the face of the complaint that *all* of the conduct alleged here is necessarily religious in nature. As the court in *Christofferson* explained, that is a particularly difficult hurdle, one that rendered the pretrial motion in that case premature:

> "There are certainly ideas which may only be classified as religious. Statements regarding the nature of a supreme being, the value of prayer and worship are such statements. There are also, however, statements which are religious only because those espousing them make them for a religious purpose."

*Id.* at 243-44. Plaintiff's complaint should be dismissed on this ground only if all of the Boyds' alleged conduct and statements are "of the type which must always and in every context be considered religious as a matter of law." *Id.* at 244. Because we are concerned here only with the allegations of the complaint, and not with any evidence that the parties might produce on the point, our task is limited to that determination.

Here, the Boyds' alleged "brainwashing" spans a wide variety of topics, some of which logically could relate to their religious beliefs (*e.g.*, that plaintiff was an instrument of Satan, was under the influence of Satan, or was Satan). ·The potential connection to religious belief is less obvious, if it is obvious at all, with respect to other allegations. For example, the complaint alleges that the Boyds accused plaintiff of physically abusing Wagner, stealing his money, and neglecting his physical needs and care. Those allegations do not reflect statements or beliefs that, as *Christofferson* would require for pretrial dismissal, "always and in every context" would be considered to be religious in nature as a matter of law. Indeed, even for those allegations that more obviously may be religious in nature, the most we can conclude from the face of the complaint is that they potentially are so, rather than that they *necessarily* are so, which is what *Christofferson* demands. *Id.* at 244. It may well be that, at some later stage of the proceedings, the trial court may determine that some of the conduct or statements alleged are "purely religious appeals" and that no other conclusion could reasonably be drawn. But a dismissal of plaintiff's claims *in toto* on this ground is premature, as it would have been in *Christofferson*. Defendants' free exercise defense, consequently, does not provide a basis for dismissal of the claims. *See Erickson v. Christenson*, 99 Or App 104, 111 n 5, 781 P2d 383 (1989), *appeal dismissed* 311 Or 266 (1991) (Free Exercise Clause of

First Amendment did not provide basis for ORCP 21 dismissal of negligence claim).

■■    As a second alternative ground for affirming the dismissal of plaintiff's IIED claims on his own behalf, defendants argue that the claims are merely disguised ones for "loss of society"—*i.e.*, the tort of alienation of affections—which defendants assert would not be actionable in a brother-to-brother relationship. We disagree that plaintiff's IIED claims are not what they purport to be. The gravamen of the tort of IIED is *"a loss due to intentionally inflicted severe emotional distress." Spiess v. Johnson*, 89 Or App 289, 294, 748 P2d 1020, *aff'd by equally divided court* 307 Or 242, 765 P2d 811 (1988) (emphasis original). The fact that, among other harms allegedly suffered, the brothers' relationship in this case also may have been damaged by defendants' actions does not automatically transform the IIED claim into one seeking to remedy that loss. *See Spiess,* 89 Or App at 294 (husband's allegations that wife's psychiatrist became sexually involved with wife, followed the family on vacations, and encouraged wife to file for divorce stated a claim for IIED, not the abolished torts of criminal conversation and alienation of affections). Even though the *means* of inflicting the distress may have involved damage to the brothers' relationship, the nature of the harm alleged—namely, severe emotional distress—makes the stated claim one for IIED. *Id.*

■    Defendants advance a third, and final, reason why we should affirm the trial court's ruling on an alternative ground. Defendants argue that they are not liable to plaintiff for the Boyds' conduct because it was directed toward plaintiff's brother, a third person, and plaintiff was not present at the time the conduct occurred. Relying on the *Restatement (Second) of Torts* § 46 (1965), defendants urge us to conclude that, when allegedly outrageous conduct is directed at a third party, rather than at a plaintiff, a defendant may be liable for IIED only under limited circumstances, none of which is alleged in this case. Specifically, section 46 provides:

> "(1)  One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional

distress, and if bodily harm to the other results from it, for such bodily harm.

"(2)  Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

  "(a)  to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

  "(b)  to any other person who is present at the time, if such distress results in bodily harm."

Neither we nor the Oregon Supreme Court has expressly adopted section 46(2) of the *Restatement;* whether we should do so presents us with an issue of first impression. In this case, however, we conclude that the issue is not presented by the allegations of the complaint.

As a threshold matter, defendants' legal position turns on categorizing plaintiff's action as a "third-party" IIED claim. We do not agree that the claim properly fits that description. Plaintiff's complaint asserts that he suffered distress because the Boyds' accused *him* of, among other things, abusing his brother, Wagner. The harm alleged is not injury derived from harm inflicted on Wagner, nor is the alleged injury incidental or collateral to any harm that Wagner allegedly suffered. Under plaintiff's allegations, plaintiff was the focus of and the subject of the Boyds' defamatory conduct. In that regard, the allegations here are parallel to those, for example, in *McCool v. Hillhaven Corporation,* 97 Or App 536, 539, 777 P2d 1013, *rev den* 308 Or 593 (1989), where the plaintiff stated an IIED claim by pleading that the defendant "falsely represented to others that [the] plaintiff was dishonest, untrustworthy, a thief and incompetent." Likewise here, plaintiff complains that the Boyds falsely represented to Wagner that plaintiff physically abused, neglected, and pilfered funds from him. By alleging that the accusations were directed against plaintiff personally, even though communicated to another, plaintiff has stated a claim as a direct victim of the Boyds' intentional conduct, not as a bystander of conduct directed at Wagner.

In sum, contrary to the trial court's determination, the allegations of plaintiff's complaint are sufficient, when viewed in the light most favorable to plaintiff, to satisfy each of the elements of a claim of IIED. Moreover, none of defendants' alternative arguments for dismissal of the complaint succeeds. We therefore conclude that the trial court erred in dismissing plaintiff's claims on his own behalf for IIED.

■■ ■■ We turn next to plaintiff's assignment that the trial court erred in dismissing his wrongful use of civil proceedings claims for failure to state a claim.[6] A plaintiff who asserts a claim for that tort must plead and prove the following elements:

"(1)  The commencement and prosecution by the defendant of a judicial proceeding against the plaintiff;

"(2)  The termination of the proceeding in the plaintiff's favor;

"(3)  The absence of probable cause to prosecute the action;

"(4)  The existence of malice, or as is sometimes stated, the existence of a primary purpose other than that of securing an adjudication of the claim; and

"(5)  Damages."

*Alvarez v. Retail Credit Ass'n*, 234 Or 255, 259-60, 381 P2d 499 (1963). *Accord Vasquez v. Reeves*, 138 Or App 153, 156, 907 P2d 254 (1995); *Parks v. Willis*, 121 Or App 72, 74 n 3, 853 P2d 1336 (1993). We readily conclude that the complaint sufficiently alleged the last four elements above—namely, termination of the proceeding in plaintiff's favor, absence of

---

[6] Defendants correctly point out that the trial court did not issue an "order" on the motion to dismiss. The trial court did, however, issue a "letter opinion" allowing defendants' motion to dismiss the wrongful use of civil proceedings claims from the second amended complaint. Plaintiff then filed a third amended complaint raising only his IIED claims. The trial court later entered judgment on the third amended complaint and noted that plaintiff's earlier claims previously had been dismissed. Although the trial court never issued a written order of dismissal on the claim for wrongful use of civil proceedings, we are satisfied that the letter opinion constitutes a ruling to which plaintiff is entitled to assign error. *See Moore v. West Lawn Mem'l Park*, 266 Or 244, 248, 512 P2d 1344 (1973) (filing of amended complaint omitting a previously dismissed claim does not waive right to assign error to that ruling on appeal).

probable cause for the action, malice, and damages—and we do not discuss those allegations further.[7] However, the first element—the commencement and prosecution of a judicial proceeding—presents a somewhat closer issue.

As plaintiff acknowledges, his complaint does not plead that the Boyds "commenced and prosecuted" the guardianship proceeding against plaintiff. Rather, the allegations are only that the proceeding was filed by plaintiff's brother because of the Boyds' encouragement and assistance. Plaintiff's theory of liability is premised on the Boyds' "active participation" in the proceeding, rather than on any assertion that they formally brought the proceeding and were parties to it. Thus, whether plaintiff has stated a claim for wrongful use of a civil proceeding rests on the legal question of whether active participation in a civil proceeding satisfies the commencement and prosecution element of the tort.

Under the *Restatement (Second) of Torts* § 674 (1977), such an allegation is sufficient. The *Restatement* takes the position that "[o]ne who takes an *active part* in the initiation, continuation or procurement of civil proceedings against another" may be liable. (Emphasis added.) Although the issue is one of first impression in Oregon, it is not one on which we lack significant guidance. The Oregon Supreme Court has adopted the "active participant" rule with respect to the related tort of malicious prosecution. *Rogers v. Hill*, 281 Or 491, 499-500, 576 P2d 328 (1978) (officer who filed reports on which prosecution based was potentially liable as "active participant").[8] In doing so, the court recognized that

---

[7] Those elements are satisfied by the allegations of the complaint that: the guardianship proceeding was terminated in plaintiff's favor and all allegations adjudicated in that proceeding were determined to be meritless; the Boyds deliberately "brainwashed" plaintiff's brother into thinking that plaintiff was pilfering funds and acting against his brother's interests (an allegation that inferentially supports a conclusion that the Boyds acted without probable cause); the Boyds' participation was malicious and for an improper purpose; and plaintiff was damaged in the amount of $30,000.

[8] *See also Restatement (Second) of Torts* § 655 (1977) (active participant in unfounded criminal proceeding may be liable for malicious prosecution); *Waldner v. Dow*, 128 Or App 197, 201-02, 876 P2d 785 (1994) (affirming liability for active participant but concluding that mere participation as a witness is not active participation).

the requirement that the defendant be the party who initiates the underlying criminal proceeding is merely a way to describe the causation element of the tort. *Id.* at 499. *See also Waldner v. Dow*, 128 Or App 197, 200-01, 876 P2d 785 (1994). In other words, that element concerns the person who serves as the impetus of the prosecution, and therefore it is not limited to the party that formally brings the action.

■     It logically follows from the Supreme Court's recognition of active participant liability for malicious prosecution claims that the same rule should apply in the context of civil proceedings. An action for wrongful initiation of civil proceedings is the civil analog to a malicious prosecution action. *Erlandson v. Pullen*, 45 Or App 467, 470, 608 P2d 1169 (1980). The torts are so similar that the legal analysis often is used interchangeably. *See Lee v. Mitchell*, 152 Or App 159, 180, 953 P2d 414 (1998) (applying analysis for malicious prosecution to action for wrongful initiation of a civil proceeding). Simply put, it would be inconsistent with the Supreme Court's holding in *Rogers* to decline to recognize active participant liability for civil proceedings.

■     We are not persuaded that extending liability on an active participant theory betrays Oregon's traditional conservative approach to actions for wrongful use of civil proceedings, as defendants argue. To be sure, the tort of wrongful use of civil proceedings is not favored in the law. *Carnation Lbr. Co. v. McKenney et al*, 224 Or 541, 547, 356 P2d 932 (1960). That is precisely why Oregon courts have placed stringent requirements on such actions, including the requirement that the plaintiff prove that the defendant acted without probable cause. *See Lampos v. Bazar, Inc.*, 270 Or 256, 527 P2d 376 (1974) (describing reasons for disfavoring tort of malicious prosecution). In recognizing active participant liability we are merely acknowledging, as the court did in *Rogers*, that a third party's participation may, in some cases, be the cause-in-fact of the harm even though the third party did not formally initiate the proceeding. Consequently, we hold that a claim for wrongful initiation of civil proceedings, like a claim for malicious prosecution, can be based on a theory of active participation in a proceeding and is not limited to direct initiation or prosecution of a civil proceeding.

■     The remaining question is whether the conduct alleged in plaintiff's complaint qualifies as "active participation." As described in the commentary to the *Restatement (Second) of Torts* § 674, an active participant is one who "sets the machinery of the law in motion, whether he acts in his own name or in that of a third person, or whether the proceedings are brought to enforce a claim of his own or that of a third person." As in a malicious prosecution action, the commencement and prosecution element in an action for wrongful use of civil proceedings pertains to the person who is a primary catalyst for the proceeding and it is not limited to the party that formally initiates it. That more encompassing understanding of the initiation element prevents one who wrongfully uses a civil proceeding to secure an end other than an adjudication of the claim from being shielded from liability merely because that person was not the party who formally filed the action. Plaintiff's allegations here satisfy both the scope of the initiation element and its spirit. Plaintiff pleaded that the guardianship proceeding would not have been brought by plaintiff's brother without the Boyds' "active encouragement, coercion and pressure" and that the Boyds in fact "were active participants" in the proceeding. Those allegations suffice.

As was true of plaintiff's IIED claims on his behalf, plaintiff brought a wrongful use of civil proceedings claim against the Boyds on a direct liability theory and a like claim against the Congregation on a vicarious liability theory. The trial court dismissed the claim against the Congregation only because it dismissed the underlying tort against the Boyds. The fate of the wrongful use of civil proceedings claim against the Congregation thus follows that of the claim against the Boyds, at least at this procedural juncture. Hence, in reversing the dismissal of the claim against the Boyds, we also reverse the dismissal of the claim against the Congregation.

We have considered defendants' remaining arguments—most of which relate to plaintiff's potential proof problems and defendants' potential affirmative defenses—and reject them, either because we find them to be without merit or because, for present purposes, they are beside the point. The only question before us is whether the complaint

stated claims on behalf of plaintiff for IIED and for wrongful use of civil proceedings. We conclude that it does. Accordingly, we reverse the trial court's dismissal of those claims.

■        We turn, then, to the trial court's grant of directed verdict on the claims that proceeded to trial—*i.e.*, the IIED claims brought by plaintiff on behalf of his brother, Wagner. After plaintiff's own claims were dismissed, the claims he brought in his capacity as Wagner's guardian were set for trial before a jury. Plaintiff presented his case-in-chief, after which defendants moved for a directed verdict on the ground that plaintiff had failed to establish any of the elements of IIED. The trial court granted defendants' motion, agreeing that none of the elements had been established and concluding, in particular, that plaintiff's evidence could not support a jury's finding that Wagner suffered from "severe emotional distress."

■        We review the directed verdict for errors of law, considering the evidence in the light most favorable to plaintiff, the party against whom the verdict was entered. *Mauri v. Smith*, 324 Or 476, 479, 929 P2d 307 (1996). We emphasize that the standard for our review of the directed verdict is substantially different from that for our review of the claims dismissed pursuant to ORCP 21 A(8). In reviewing the ORCP 21 A(8) dismissals, we were limited to determining whether the facts as alleged in the complaint stated a claim.[9] Our review of a directed verdict, on the other hand, examines the evidence presented at trial. As we detail below, based on the testimony presented at trial (in particular, that of plaintiff, Wagner, and various experts and social workers), we agree with the trial court's assessment that a reasonable jury could not have concluded that Wagner's emotional distress was severe.

        The record discloses the following facts. Plaintiff's brother, Wagner, has been a devoted member of the Jehovah's Witness faith since the late 1970s. He developed that

---

[9] We note this, in part, because defendants lace their discussion of the ORCP 21 A(8) dismissals with factual hindsights from the trial on the other claims. We did not consider their factual arguments on those points because, on review of the dismissals, we were limited to the four corners of the complaint.

interest through his mother, who was also a Jehovah's Witness, and Wagner continued to pursue that interest after plaintiff became his guardian in 1981. In the early 1990s, Wagner met the Boyds through the Congregation, where Mr. Boyd served as an elder. The Boyds drove Wagner to Congregation meetings, took him on outings with their family, and regularly spoke with him on the telephone. In 1993, the relationship between Wagner and plaintiff began to deteriorate. Wagner appeared more "withdrawn" around and "less interested" in his brother and other family members. The two brothers also began to argue about the extent to which Wagner should be involved in the Congregation. For example, Wagner wanted to become involved in the Congregation's door-to-door proselytizing activities. Plaintiff, citing concerns for Wagner's safety, would not allow Wagner to participate.

The tension between the brothers escalated in February 1994, when Wagner complained to a state Disability Services caseworker that plaintiff was not properly caring for him. The Boyds drove Wagner to that meeting, introduced him to the caseworker, and participated in the discussion. Wagner explained that he wanted his "competency" restored and provided a list of grievances. Those grievances included concerns about the infrequency of bathing, the lack of vegetables in his diet, and the poor quality of his clothing. Wagner also requested that he be allowed to attend more meetings and to associate more frequently with members of the Congregation. The next day, the disability caseworker visited the brothers' home and met with plaintiff. The caseworker observed that Wagner had plenty of adequate clothing and an ample supply of fruits and vegetables. Plaintiff acknowledged, however, that his back problems prevented him from bathing Wagner more than once a week. The caseworker found no evidence of physical or emotional abuse. When the caseworker discussed with Wagner the inaccuracies of his allegations, Wagner admitted that he had "forgotten these things" and emphasized that his main complaint was that he wanted to spend more time with other Jehovah's Witnesses.

After that meeting, plaintiff consulted with an attorney and, as a result, decided not to allow Wagner to associate with the Boyds anymore. Plaintiff prohibited Wagner from

visiting the Boyds and significantly reduced the number of meetings that Wagner could attend. The day after meeting with plaintiff, his attorney sent "cease and desist" letters to the Boyds and to the Congregation. Plaintiff's attorney accused defendants of interfering with the guardian/ward relationship by encouraging Wagner "to live with them," by hiring an attorney "to sever the relationship * * * in favor of themselves," and by fabricating "false reports" of abuse and neglect. Plaintiff's attorney also demanded that the Boyds "cease and desist" from further contact with Wagner. Despite receiving the letter, the Boyds continued to talk with Wagner by telephone and arranged for Wagner to consult with an attorney. They drove him to the attorney's office for the appointment and participated, to some extent, in that meeting. Mrs. Boyd maintained telephone contact with Wagner's attorney.

Some months later, Wagner's attorney filed a petition to have plaintiff removed as conservator and guardian and to appoint a successor. Plaintiff testified that Wagner vacillated on his decision to pursue plaintiff's removal as guardian and conservator but that, whenever he expressed doubts, he would discuss the matter with someone from the Congregation, who would encourage him to proceed. Wagner ultimately followed through with the removal petition. After an exhaustive accounting, investigation, and hearing, the probate court declined to remove plaintiff as Wagner's guardian and conservator. Instead, the court imposed guidelines for resolving disputes between the brothers and instructed plaintiff to allow Wagner to worship with a different congregation. Following the proceeding, plaintiff concluded that his relationship with Wagner had been irreparably damaged. He therefore sold the house in which he and Wagner had lived together, placed Wagner in an adult foster care facility, and brought this action against defendants.

In his testimony at trial, Wagner displayed an unequivocal devotion to his faith and described it as his "life." He expressed fondness for the Boyds and a vehement opposition to plaintiff's lawsuit. He blamed plaintiff for placing him in the middle of the dispute and described the plaintiff as taking "vengeance on the church." Wagner testified as follows:

"Q. Do you think the Boyds have ever tried to hurt you in any way?

"A. No.

"Q. Do you think the Boyds have ever caused you any emotional distress?

"A. No.

"Q. Do you think anyone from the church has ever caused you any emotional distress?

"A. No."

Wagner emphasized that he felt at all times that the Boyds were trying only to help him and that they had demonstrated love and encouragement toward him. When asked if it was difficult to be caught in the middle of plaintiff and the church, Wagner's only response was that "it wasn't easy."

Although Wagner denied that he had suffered from distress as a result of the Boyds' conduct, plaintiff presented testimony from others who testified to Wagner's apparent emotional state at various times. Wagner, by several witnesses's accounts, felt torn between his loyalty to his church and to his family. Aside from that general description, however, only a few witnesses testified to Wagner's apparent sense or level of distress over the situation. His disability services caseworker testified that Wagner, on a single occasion, told her during a telephone call that he was "feeling much stress."[10] Plaintiff's own testimony about Wagner was that Wagner's emotions were "hard to read," that he became less "happy-go-lucky" through the general time period in question, and that, on one occasion, he seemed "kind of depressed" or "kind of down."

The most detailed description of Wagner's apparent emotional response to the guardianship problems came from Wagner's psychologist, who counseled him through much of the period involved, and whom plaintiff called as a witness. The psychologist explained that Wagner's brain injury

---

[10] The caseworker, in her testimony, does not relate why Wagner was feeling stress or whether he even said why. She does describe him as telling her about the stress at the same time that he told her he was suffering "mini" epileptic seizures, apparently related to his brain injury.

causes him to have a flatter emotional response to situations than he might have otherwise and to have a particularly mild manner. As a result, Wagner reacts less strongly to conflict or stress. Wagner had expressed feeling "badly" for initiating the guardianship proceedings, which the psychologist understood to be an expression of "some guilt" for doing so. Diagnostically, on a scale ranging from mild to moderate to severe, the psychologist rated Wagner's stress over the guardianship conflict as "mild."[11]

In examining the severity of a plaintiff's distress, we consider its "duration and intensity." *Kraemer v. Harding,* 159 Or App 90, 112, 976 P2d 1160, *rev den* 329 Or 357 (1999). *See also Rockhill v. Pollard,* 259 Or 54, 63-64, 485 P2d 28 (1971) (distress must be "more than mild and transitory"). On this record, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could have concluded that: (1) Wagner's assessment of his distress should be discounted because he has a limited ability to assess the existence and cause of his own distress;[12] (2) other evidence in the record demonstrated that Wagner suffered from some emotional upset as a result of defendants' conduct; and (3) some of the emotional upset he experienced continued over an extended period of time. But plaintiff's evidence falls short in reflecting

---

[11] From his testimony, the psychologist's rating of Wagner's stress as "mild" appears in part relative to the individual involved. That is, the psychologist stated that he considered Wagner's stress due to the conflict over the guardian care to be mild, in part because that was Wagner's apparent reaction at the time, and in part because Wagner's later circumstances caused him a greater level of stress. The later circumstances that the psychologist described are not implicated by the IIED claim. Rather, they concern Wagner's reaction to his placement in a residential care facility after plaintiff decided that the brothers' relationship was irreparably damaged and they could no longer reside together. At that point, due to Wagner's cognitive limitations in assessing social situations, he at times became "very irate and upset" over his perceptions of other people's activities. Likewise, the psychologist as well as other witnesses testified to Wagner's agitation and anger over the filing of this lawsuit. Again, the psychologist's testimony suggests that he assessed Wagner's anger and agitation in that regard to reflect some greater amount of stress than his reaction to the earlier guardianship conflict. Even as to the greater anger that Wagner later experience, it was of a "normal" and "predictable" kind, one the psychologist characterized as "an anger that most anyone would have if they disagree with something."

[12] Although Wagner's psychologist did not directly call into doubt Wagner's ability to assess his own emotions, a jury at least arguably could draw that inference from the psychologist's description of Wagner as having limited cognitive ability and memory impairment generally.

the necessary intensity of whatever distress Wagner suffered. Wagner's psychologist, who provided the most extensive testimony on Wagner's emotional reactions, described Wagner as unlikely, due to his mental disability, to feel strong anguish or experience strong emotional responses. The strongest emotional response he knew Wagner to have experienced over the conflict with his brother was anger of a kind that anyone would feel over any disagreement. Even viewing the evidence and all reasonable inferences in the light most favorable to plaintiff, the record simply does not support a finding that any distress Wagner suffered was *severe. See Rockhill*, 259 Or at 63-64; *Restatement (Second) of Torts* § 46 comment j (1965) ("The law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity.").[13] The trial court did not err in directing verdict on Wagner's claims and on the dependent vicarious liability claims against the Congregation.[14]

■ Plaintiff also assigns error to several of the trial court's evidentiary rulings, including the trial court's exclusion of evidence obtained during taped telephone conversations between Wagner and members of the Congregation[15] and the trial court's refusal to allow the testimony of two experts who, according to plaintiff, would have testified on the nature of the guardianship proceedings and on the practices of "high-thought control groups."

■ In addition to demonstrating that the trial court erred, plaintiff must demonstrate that the alleged error is reversible—that is, that it would have affected the outcome of the case. *See* OEC 103(1) (evidential error is not presumed to

---

[13] *See also* Uniform Civil Jury Instruction No. 40.04 defining "severe emotional distress" as including "mental suffering, mental anguish, mental or nervous shock, fright, and all highly unpleasant mental or emotional reactions."

[14] Because the viability of the vicarious liability claim against the Congregation depends on the Boyds' liability for the underlying claim, the trial court properly directed verdict against that claim as well.

[15] Defendants argued that the use of the tapes violated Oregon's wiretapping statute, ORS 165.540, the Federal Wiretap Act, Title III of the Omnibus Crime Control and Safe Streets Act, 18 USC §§ 2510-2522, OEC 403, and the First and Fourteenth Amendments to the United States Constitution.

be prejudicial). Traditionally, reversible error is demonstrated by way of an offer of proof. *See State v. Affeld*, 307 Or 125, 128, 764 P2d 220 (1988) (purpose of offer of proof is to demonstrate reversible error); OEC 103(1)(b). We have reviewed the offers of proof here and conclude that none of the excluded evidence would have added anything of significance to demonstrate that Wagner's emotional distress was severe enough to support an IIED claim. Thus, we decline to resolve those evidentiary issues, because plaintiff has not demonstrated any error that would justify reversal. *See Baker v. English*, 324 Or 585, 589-93, 932 P2d 57 (1997) (erroneous ruling in civil case is reversible only if it substantially affected a right of the party claiming the error); *Quirk v. Ross*, 257 Or 80, 85, 476 P2d 559 (1970) (declining to decide evidentiary issue when consequences of potential error would not have justified reversal).

Accordingly, we reverse and remand the trial court's dismissal of plaintiff's own claims for IIED and wrongful use of civil proceedings brought against the Boyds as well as plaintiff's related claims for IIED and wrongful use of civil proceedings brought against the Congregation on a theory of vicarious liability. We affirm the directed verdict on the claims brought on Wagner's behalf.

Dismissal of plaintiff Checkley's claims brought on his own behalf for intentional infliction of emotional distress and wrongful use of civil proceedings reversed and remanded; otherwise affirmed.