**Edward MARTISZUS, Plaintiff,**

v.

**WASHINGTON COUNTY, a political subdivision of the State of Oregon; Deputy Candilora, personally, Defendants.**

**Civil No. 03–750–MO.**

United States District Court,
D. Oregon.

July 21, 2004.

---

Leonard R. Berman, Beaverton, OR, for Plaintiff.

Elmer Manuel Dickens, Jr., Washington County Counsel, Hillsboro, OR, for Defendants.

## OPINION AND ORDER

MOSMAN, District Judge.

In this civil-rights lawsuit, plaintiff Edward Martiszus claims that a Washington County Deputy Toby Candilora drew his gun on plaintiff and detained him simply because he was repairing his Volkswagen Beetle on the side of the road. Consequently plaintiff brings a Section 1983 claim for unlawful seizure in violation of the Fourth Amendment. In response, Candilora asserts the defense of qualified immunity. Plaintiff also seeks to impose liability on the county. Both sides have

moved for summary judgment. For the reasons explained below, the court denies plaintiff's motion for summary judgment in full and also denies defendants' motion for summary judgment as to plaintiff's Fourth Amendment claim.

## I. BACKGROUND

The parties dispute much of the underlying events in this case. Their stories are discussed in some detail below.

On August 19, 2002, at about 2:00 a.m., defendant Toby Candilora, a Washington County deputy, was on patrol in a rural part of the county. He saw a Volkswagen Beetle sitting idle on the side of a road. The car's lights were not on, but its driver-side door was open. Although Deputy Candilora stated in a narrative report that plaintiff's car did not appear to be disabled, he stated in the same report that the reason he contacted plaintiff was to "check his welfare and determine if he needed assistance." An internal report written by county officials similarly stated that the reason Candilora originally stopped was "to assist the [plaintiff] with a possible broken down car."

As he approached the car, Deputy Candilora saw a leg hanging out of the open door, causing Candilora to turn his car around and park behind the idle Beetle. Candilora never turned on his car's sirens. Because of heavy radio traffic, Candilora was unable to reach police dispatch.

Deputy Candilora exited his car and approached the Beetle. He saw a man standing at the rear of the Beetle. The man turned out to be Edward Martiszus, a registered nurse and the plaintiff in this lawsuit. He testified at his deposition that at the time Candilora's car pulled in he was bending over working on his Beetle.

Plaintiff further testified as follows: As Deputy Candilora approached, he asked, "What's up?" or "What are you doing?" Plaintiff answered, "I'm working on my car," and continued to do so. Candilora then asked plaintiff whether he had his driver's license, to which plaintiff responded: "I don't really have time for this right now. Go bother somebody else." After plaintiff's refusal to produce a driver's license, Candilora became angry. Plaintiff testified to what happened next:

> [T]he next thing I heard was "Drop it," as I was working on my car, on my feeler gauge. I said, "Drop what?" And I looked over my head and I looked right down the barrel of a pistol pointed at my face.

Thus, according to plaintiff's version of events, he was knelt over working on his car when Candilora pulled and pointed the gun. Next, after Candilora told plaintiff to "drop it," plaintiff, while still bending over the Beetle, dropped what he was holding: a screwdriver in one hand and a metal-bladed tool (specifically, a "feeler gauge") in the other hand. Then, pursuant to Candilora's orders, plaintiff stood up and faced the deputy. The two stood about three or four feet from each other. After a couple seconds facing each other, Candilora holstered his gun.

Candilora again asked plaintiff to produce identification, but plaintiff responded: "No, I don't see any reason why I should. I'm working on my car here." Candilora responded, something like: "Who do you think you are? Maybe I should arrest you." The two then continued a little longer, with Candilora asking for a driver's license and plaintiff refusing to produce it. (At his deposition, plaintiff explained he did not want to produce his driver's license because he felt that it was his constitutional right not to produce the license given he was merely repairing his car.) At some point, Candilora stated, "Shut your mouth, shut your f* *ing mouth." (During the encounter, Candilora used the word "f* *k" multiple times.)

Candilora next ordered plaintiff to turn and put his hands behind his back. Plaintiff complied and Candilora handcuffed him; shortly thereafter, Candilora placed plaintiff in the back of the patrol car where he ultimately sat for about ten minutes. While in the patrol car, Candilora regained his cool and plaintiff finally produced his driver's license. When Candilora confirmed plaintiff owned the Beetle and that there were no outstanding warrants for him, Candilora released the handcuffs and allowed him to resume repairing the car.

Candilora testified that although he did not know exactly what type of crime might be afoot, he felt he had "reasonable suspicion to believe that a crime was occurring." He testified that when he saw plaintiff bent over with his leg draped from the car, several thoughts entered his mind: "Is this person under the influence of alcohol? Is this person—you know, mental problems? Is somebody being assaulted in the car? Does this person possibly need medical?" Candilora further opined that plaintiff was required to produce a driver's license because there was reasonable suspicion of a crime.

Deputy Candilora's version of what happened differs slightly from plaintiff's version in other respects as well. For instance, Candilora said he told plaintiff to "drop the weapons" and said this while his hand was on the gun. Candilora, however, disputes that he even actually drew the gun and pointed it at plaintiff. In addition, according to Candilora, upon approaching the Beetle, he called out, "Hi, Washington County Sheriff's Office." In response, plaintiff allegedly did not turn around, continued to lean over the Beetle's engine compartment, and stated "F* *k you, leave me the f* *k alone." Candilora's version also alleges that each time he

asked for identification, plaintiff cursed in response. (Candilora, however, admits that he used curse words because his adrenaline ran high during the encounter.) Plaintiff, however, denies ever cursing. Candilora further takes the position that plaintiff never said he was repairing his car until he had been placed in the patrol car.

The next day, plaintiff called the county to complain about the encounter. In response, the county initiated an internal investigation. Investigative officials "exonerated" Candilora from the allegation he had used "excessive force" by drawing his weapon. (Under the investigative unit's definitions, "exonerated" means the complained-about action was "lawful and proper.") The county, however, found that Candilora violated county policy by using profanity during the encounter with plaintiff.

Washington County Sheriff Rob Gordon also reprimanded Candilora for telling plaintiff to "shut his f* * *ing mouth." Candilora conceded he should have acted in a more "composed" fashion. Sheriff Gordon also wrote a letter directly to plaintiff explaining the county's internal findings: "[T]here are some issues in this event that we found were handled less professionally that we would have liked. Our policy requires deputies, even in the face of great provocation, to behave calmly. The deputy in this call did not meet that requirement."

Based on these events, plaintiff asserts several claims. He brings constitutional claims under Section 1983 based on the Fourth Amendment and the Due Process Clause.[1] Plaintiff additionally brings various state law claims: wrongful imprison-

---

1. In response to defendant's summary judgment briefing on the due-process claim plaintiff concedes that this claim lacks merit.

Thus the court grants summary judgment against his due process claim.

ment, negligent hiring, and intentional infliction of emotional distress.

Defendants moved for summary judgment against all of plaintiff's claims. Plaintiff, in turn, moved for partial summary judgment on "liability" as to his Fourth Amendment claim against Candilora. Plaintiff further seeks summary judgment as to his claim for municipal liability against the county.

## II. STANDARD OF REVIEW

Summary judgment is only proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(e). If the movant initially shows that no genuine issue exists for trial, the non-movant cannot then rest on the pleadings but must respond with evidence setting "forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The non-movant's evidence must create more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Evaluating whether a genuine issue of material fact exists requires the court to view the record in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. MUNICIPAL LIABILITY

In addition to seeking to hold Candilora individually liable for the alleged constitutional violations, plaintiff also seeks to impose municipal liability on the county. As briefly outlined below, the court finds that summary judgment is appropriate against plaintiff's federal claims insofar as those claims seek to hold the county liable.

In order to hold a local governmental entity liable for money damages under Section 1983, the plaintiff must es-tablish a governmental custom or policy which caused the alleged constitutional violation. See *Monell v. Department of Social Servs.*, 436 U.S. 658, 691–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Thus the local entity "may not be held vicariously liable for the unconstitutional acts of its employees under the theory of *respondeat superior.*" *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir.1992). Supreme Court cases support three primary theories under which a plaintiff may meet the *Monell* threshold: The plaintiff may establish the local official "committed the alleged constitutional violation pursuant to a formal governmental policy or a 'longstanding practice or custom.' " *Id.* (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). Alternatively the plaintiff may show that the tortfeasor made the decision at issue in his or her capacity as " 'final policy-making authority.' " *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). Third, if an official with such policy-making authority "ratified" a subordinate tortfeasor's decision, the plaintiff states a claim. *Id.* at 1346–47 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality)).

Plaintiff cannot meet the standard for establishing local government liability. He does not contend that Deputy Candilora had any relevant policy-making authority. Plaintiff also does not produce evidence of any relevant formal policy. Nor can plaintiff show that the incident at issue reflects a county custom, since he produces no evidence showing Candilora acted pursuant to "a traditional method of carrying out policy," *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.1996), or a practice "so widespread as to have the force of law," *Board of County of Comm'rs of Bryan County v.*

*Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

■ Instead, to support imposing liability on the county, plaintiff cites a single piece of evidence. Specifically, plaintiff points to an internal report created by the county's "professional standards unit." The report "exonerated" Candilora from plaintiff's complaint of "excessive force." Plaintiff argues the fact the county "exonerated" Candilora constitutes evidence of its "ratification" of Candilora's decision to draw his gun, thus supporting liability against the county. Plaintiff's theory is a stretch. In exonerating Candilora, investigative officials relied on the version of events as conveyed by Candilora, which, of course, plaintiff largely disputes. For example, the report was written with the understanding that Candilora "was concerned for his safety" and that he merely "*attempted* to draw his weapon," after plaintiff "turned quickly while holding a screwdriver in one hand and a leatherman with the blade exposed in the other." This description of events stands in contrast to that presented by plaintiff. Thus there is no indication the county "ratified" any improper conduct on the part of Candilora; indeed, the county investigated the incident to ensure Candilora acted appropriately.

In sum, the court rejects plaintiff's "ratification" theory, since there is no support for plaintiff's position that the county endorsed officers' pulling guns on citizens repairing cars even in the absence of reasonable suspicion or safety concerns. Cf. *Gillette,* 979 F.2d at 1347–48 (reasoning to find municipal liability under a "ratification" theory requires a showing the "policymaker approve[d] a subordinate's decision *and the basis for it* " (emphasis in original)).

## IV. QUALIFIED IMMUNITY

■ Against plaintiff's Fourth Amendment claim, Candilora invokes the defense of qualified immunity. Qualified immunity involves a two-part inquiry: First, the court must determine whether, taken in the light most favorable to plaintiff, the allegations show that a constitutional violation occurred. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if the court answers this issue in the plaintiff's favor should the court proceed to the second step of the analysis. *Id.* Under the second step, the court must determine whether it would have been clear to a reasonable officer that the defendant's conduct was "unlawful in the situation he confronted." *Id.* If a reasonable officer "could have believed" the defendant's conduct was lawful, he is entitled to qualified immunity. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Applying qualified immunity's two-part framework, the court turns to plaintiff's Fourth Amendment claim.

### A. Arrest or Detention

As an initial matter, the parties disagree as to the nature of plaintiff's "seizure." Plaintiff claims Candilora's aggressive conduct during the encounter gave rise to a full-fledged arrest. Plaintiff thus argues that Candilora must be able to show that probable cause existed for the seizure. Candilora concedes probable cause did not exist to support an arrest. He also concedes that at some point during the encounter a seizure occurred triggering Fourth Amendment protections. But, in contrast to plaintiff's contention that the seizure was an arrest, Candilora argues that only a "detention" occurred, consistent with the Supreme Court's landmark decision in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Under *Terry*, Candilora emphasizes, an officer need not have probable cause to detain a suspect, but instead need only have "reasonable suspicion" that "criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Terry*, 392 U.S. at 30, 88 S.Ct. 1868). Candilora argues that he had reasonable suspicion to detain plaintiff and thus the detention was reasonable under the Fourth Amendment.

■ In light of Candilora's concession that probable cause did not exist, whether he arrested plaintiff or conducted only a *Terry* detention is a potentially decisive issue. Unfortunately, there is " 'no bright line rule for determining when an investigatory stop crosses the line and becomes an arrest.' " *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir.1995) (quoting *United States v. Parr*, 843 F.2d 1228, 1231 (9th Cir.1988)). Instead "whether an arrest has occurred depends on all the surrounding circumstances." *Id.*; see also *Gallegos v. City of Los Angeles*, 308 F.3d 987, 991 (9th Cir.2002) (observing that "whether a police detention is an arrest or an investigatory stop is a fact-specific inquiry, guided by the general Fourth Amendment requirement of reasonableness" (citation omitted)).

The court concludes that it need not—at least for purposes of determining whether summary judgment is appropriate—decide whether plaintiff's detention became a full-fledged arrest. As discussed below, the court finds that even if Candilora conducted at most a *Terry* detention, there are material fact issues preventing summary judgment on the issue of whether Candilora's conduct was lawful when analyzed under the *Terry* framework. Accordingly, the court need not consider the parties' arguments concerning whether Candilora arrested plaintiff.

## B. Constitutional Violation

### 1. *Terry* Framework

The threshold question is whether Candilora's seizure of plaintiff was a constitutional *Terry* detention. In answering this question, the court again emphasizes that the record must be read in plaintiff's favor. Under this deferential standard of review, the court finds material issues of fact regarding whether an unconstitutional detention occurred. Before evaluating the particular circumstances presented, a review of some basic Fourth Amendment principles is in order.

■ "It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime— 'arrests' in traditional terminology." *Terry*, 392 U.S. at 16, 88 S.Ct. 1868. Thus "detentions" short of arrests qualify as seizures within the scope of the Fourth Amendment. A "seizure" implicating the Fourth Amendment does not occur, however, simply because an officer approaches a citizen out of concern or merely to talk:

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen...."

See *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality)); see also *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). Nor does the "fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure." *Royer*, 460 U.S. at 497, 103 S.Ct. 1319 (plurality). Rather a seizure within the reach of the Fourth Amendment oc-

curs only when "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. 1868. Thus a seizure does not result if "a reasonable person would feel free 'to disregard the police and go about his business.'" *Bostick*, 501 U.S. at 434, 111 S.Ct. 2382 (quoting *California v. Hodari D.*, 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)).

■■■ As mentioned, to effect a *Terry* detention, an officer must have reasonable suspicion the suspect is connected to illegal activity. To determine whether reasonable suspicion exists, the court must carefully consider the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273–74, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). In addition, it is important to bear in mind that otherwise perfectly innocent facts may, when taken together as a whole, give rise to reasonable suspicion. *Id.* At the same time, however, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the suspicion. *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. Stated somewhat differently, when detaining a suspect, the "officer must be able to articulate more than an 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity." *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868); see also *Arvizu*, 534 U.S. at 274, 122 S.Ct. 744 ("an officer's reliance on a mere 'hunch' is insufficient to justify a stop."). "This demand for specificity in the information upon which police action is predicated is the central teaching of th[e] Court's Fourth Amendment jurisprudence." *Terry*, 392 U.S. at 21 n. 18, 88 S.Ct. 1868; accord *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). As the Supreme Court very recently explained: Absent "specific, objective facts establishing reasonable suspicion to believe the suspect was involved in criminal activity," upholding a detention under such circumstances furthers tolerance of an unacceptable risk of " 'arbitrary and abusive police practices.'" *Hiibel v. Sixth Judicial Dist. Court of Nev.*, —— U.S. ——, ——, 124 S.Ct. 2451, 2457, 159 L.Ed.2d 292 (2004) (citation omitted).

■■■ Importantly, when there otherwise is an absence of reasonable suspicion, an officer may not use a citizen's "refusal to cooperate [to] furnish the minimal level of objective justification needed for a detention." *Bostick*, 501 U.S. at 437, 111 S.Ct. 2382. Thus an officer may not use a citizen's refusal to provide identification as the basis for a detention. See *Brown v. Texas*, 443 U.S. 47, 51–52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); see also *Royer*, 460 U.S. at 498, 103 S.Ct. 1319 ("He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." (plurality)). Although the Supreme Court recently held that an officer may arrest a suspect for his refusal to provide identification, the Court emphasized there must be reasonable suspicion independent of that refusal. See *Hiibel*, —— U.S. at ——, ——, 124 S.Ct. at 2457, 2459.[2]

---

**2.** The *Hiibel* decision, however, does undercut Ninth Circuit precedent which supports the proposition that an officer may not seize a citizen for failing to provide identification *even* when the officer otherwise had reasonable suspicion that criminal activity was afoot. See *Carey v. Nevada Gaming Control Bd.*, 279 F.3d 873, 880 (9th Cir.2002) (relying on *Martinelli v. City of Beaumont*, 820 F.2d 1491 (9th Cir.1987) & *Lawson v. Kolender*, 658 F.2d 1362 (9th Cir.1981)).

A final aspect of the *Terry* doctrine is relevant to the case at bar. Though an officer's detention may have been justified at its inception, the detention exceeds *Terry's* boundaries when it continues unreasonably despite dissipation of the officer's initial suspicion. See *Terry*, 392 U.S. at 20, 88 S.Ct. 1868. As explained by *Hiibel*:

> To ensure that the resulting seizure is constitutionally reasonable, a *Terry* stop must be limited. The officer's action must be "justified at its inception, and ... *reasonably related in scope to the circumstances which justified the interference in the first place*." For example, the seizure cannot continue for an excessive period of time, or resemble a traditional arrest.

*Hiibel*, —— U.S. at ——, 124 S.Ct. at 2458 (emphasis added) (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. 1868). During a *Terry* detention, therefore, officers may act to "verify or dispel their suspicions," *Royer*, 460 U.S. at 502, 103 S.Ct. 1319 (plurality); but once suspicions no longer reasonably exist, an officer may not continue to detain the person.

## 2. Detention of Plaintiff

Applying these Fourth Amendment principles, and reading the record in plaintiff's favor, the court concludes that material issues of fact exist.

At the outset, the court notes the record shows that a detention did not arise when Candilora first approached plaintiff. After Candilora parked his car, he approached plaintiff and asked innocuous questions such as "What's up?" Plaintiff allegedly told Candilora that he was repairing his car. There is no indication plaintiff, at that time, did not feel at liberty to "go about his business." *Bostick*, 501 U.S. at 437, 111 S.Ct. 2382. Indeed, plaintiff testified, he continued to work on his car despite Candilora's presence. Plaintiff did not cease "going about his business" until Candilora allegedly drew his weapon and told plaintiff to drop his tools. On this record, the court concludes that Candilora did not detain plaintiff, and thus trigger the Fourth Amendment, until he drew his gun.

Thus the issue is whether at that time Candilora had reasonable suspicion, that is, suspicion amounting to more than an " 'inchoate and unparticularized suspicion or hunch.' " *Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 (citation omitted). Reading the record in favor of plaintiff, the court concludes that Candilora lacked reasonable suspicion when he detained plaintiff.

Although at his deposition Candilora identified a number of hunches he had (such as that plaintiff might have been drunk or involved in an assault), he has not pointed to "specific and articulable facts," *Terry*, 392 U.S. at 21, 88 S.Ct. 1868, which would support a reasonable belief that criminal activity was afoot. Indeed reports drafted near the time of the incident suggest that Candilora stopped simply to see if the plaintiff needed assistance. In his report, for example, Candilora explained: "I told [plaintiff] I was trying to contact him to check his welfare and determine if he needed assistance." Ex. 5–4. An officer who investigated the incident similarly concluded that "Deputy Candilora stopped *to assist* the [plaintiff] with a possible broken down car." Ex. 5–9 (emphasis added). Drawing inferences in plaintiff's favor, the record, in sum, indicates that the scene appeared such that Candilora merely made the "commonsense judgment" that a citizen was having some car trouble. Cf. *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673 ("the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior."). Observing someone standing on the shoulder of the road next to a car cannot, without more, support a

finding of reasonable suspicion. Cf. *id.* at 124, 120 S.Ct. 673 ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." (citing *Brown,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357)). In fact, Sheriff Gordon, when pressed at his deposition, conceded he could not "piece together any facts about [plaintiff's] conduct, crouched behind his immobile Volkswagen, that would tie to any specific crime."

Nothing occurred after Candilora pulled his patrol car over which would have given rise to reasonable suspicion, again taking the record in plaintiff's favor. In response to Candilora's questions, plaintiff unequivocally explained he was "working on his car." Plaintiff's conduct, kneeling down with his hands in the car's engine area, only confirmed his oral response. Indeed plaintiff held tools in his hands.

In his internal report, Candilora described his version of a conversation he had with plaintiff; that description further indicates the proper approach under the circumstances confronting Candilora did not include detention:

> I told [plaintiff] if he would have explained he was working on his vehicle, I could have contacted a tow truck, called for a taxicab or provided him with a ride to a safe location. I also told [plaintiff] had he explained he was okay and did not require my assistance, I would have left him to continue working on his vehicle.

Accepting plaintiff's version of events, as the court must, plaintiff did in fact tell Candilora he was working on his car and that he did not want to be "bothered." Instead of offering assistance or leaving plaintiff behind, the record for summary judgment purposes is that Candilora detained plaintiff by drawing a gun, hand-cuffing plaintiff, and putting him in the patrol car.

Moreover, on this record, a reasonable juror could conclude that plaintiff's detention was based, not on suspicion of criminal activity, but on plaintiff's failure to provide identification and respond fully to Candilora's questions. Candilora allegedly did not draw his weapon until plaintiff refused to produce his driver's license and told Candilora to go "bother somebody else." After Candilora drew his weapon, plaintiff understandably changed his tone, dropping his tools and quickly standing upright to face Candilora. Plaintiff, however, still would not turn over his driver's license, despite Candilora's repeated requests for it. Plaintiff once again explained he was merely working on his car. Ostensibly making good on his angry threat to "arrest" plaintiff if he did not produce identification, Candilora then handcuffed plaintiff and put him in the back of the patrol car, all while cursing him. Based on this interaction, Sheriff Gordon found that Candilora improperly lost his cool.

Because plaintiff's version of events shows inadequate support for Candilora's claim of reasonable suspicion, a jury could fairly find that, at bottom, Candilora detained plaintiff for essentially being disrespectful. As discussed above, a detention based on mere failure to cooperate is unconstitutional. See *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382; *Brown,* 443 U.S. at 51–52, 99 S.Ct. 2637; see also *Hiibel,* —— U.S. ——, 124 S.Ct. 2451, —— L.Ed.2d —— (emphasizing that suspect may be arrested for failing to provide identification only if reasonable suspicion separately existed to support the initial detention).

The court finally concludes that, even assuming that Candilora initially had reasonable suspicion when he drove by plaintiff's car and saw his leg hanging from it, there are material fact issues as to wheth-

er the detention was "reasonably related in scope to the circumstances which justified" Candilora's initial stop. *Terry,* 392 U.S. at 20, 88 S.Ct. 1868; see also *Kraus v. County of Pierce,* 793 F.2d 1105, 1108 (9th Cir.1986) (" 'An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.' " (quoting *Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229)). Candilora's deposition testimony states he thought plaintiff might, for instance, have been drunk or perhaps involved in an assault. Accepting plaintiff's story, he immediately told Candilora he was working on his car, an explanation amply supported by the circumstances. Any suspicion of criminal activity Candilora had was therefore quickly dispelled; he points to no facts arising during his face-to-face encounter with plaintiff which would have supported a reasonable belief that plaintiff was involved in illegal conduct.

In summary, on this record, the court finds material issues of fact supporting plaintiff's unlawful-detention claim. The second question is whether the law was clearly established.

## C. Reasonableness

The second qualified-immunity inquiry is whether it would have been clear to reasonable officers that Candilora's alleged conduct was unlawful. See *Katz,* 533 U.S. at 201, 121 S.Ct. 2151. The court concludes there are too many fact issues to conclude that Candilora acted reasonably under the circumstances.

As discussed *supra,* the record can be read to support the conclusion Candilora stopped his patrol car with the intention of simply inquiring whether plaintiff needed assistance, but ultimately detained plaintiff for being uncooperative. Candilora has failed on this record to show conclusively that there were specific and articulable facts constituting reasonable suspicion.

With this factual background in mind, the relevant legal principles were clearly established at the time Candilora acted. The Supreme Court established long ago that an officer must "be able to point to specific and articulable facts" giving rise to suspicion of criminal activity before detaining a citizen. *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. Also well established is the principle—which the Supreme Court recently reaffirmed—that a citizen may not be detained for failing to produce identification or otherwise cooperate absent preexisting reasonable suspicion. See *Hiibel,* —— U.S. at ——, 124 S.Ct. at 2457 (discussing *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)); see also *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382. In a roughly similar case, Judge Koziniski reasoned that an officer was not entitled to qualified immunity for his detaining a citizen without reasonable suspicion, even though the citizen lodged obscenities at the officer and thus showed manifest disrespect for the officer's authority:

The only remaining issue, then, is whether the rights here in question were so clearly established that [defendant officer] should have known he was acting illegally when he initiated the traffic stop.... If there is one irreducible minimum in our Fourth Amendment jurisprudence, it is that a police officer may not detain an individual simply on the basis of suspicion in the air. No matter how peculiar, abrasive, unruly or distasteful a person's conduct may be, it cannot justify a police stop unless it suggests that some specific crime has been, or is about to be, committed, or that there is an imminent danger to persons or property. Were the law any different—were police free to detain and question people based only on their hunch that something may be amiss—we would hardly have a need for the hun-

dreds of founded suspicion cases the federal courts decide every year, for we would be living in a police state where law enforcement officers, not courts, would determine who gets stopped and when.

No less well established is the principle that government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely anyone who takes an oath of office knows—or should know—that much.

*Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir.1990). In sum the legal principles in play were so clearly established that, if the events were as plaintiff describes, Candilora is not entitled to qualified immunity as to plaintiff's Fourth Amendment claim.[3]

## V. STATE LAW CLAIMS

Plaintiff also brings state law claims. Plaintiff states a claim for wrongful imprisonment which, the complaint alleges, was "due to negligence." Plaintiff also asserts a count for general negligence which is based on the alleged "negligent hiring, training, and supervision of Candilora by Washington County." Plaintiff brings a third state law claim, one for intentional infliction of emotional distress. For the reasons briefly outlined below, the court grants summary judgment against these state law claims.

■ As for the wrongful-imprisonment claim, defendants argue that Oregon law does not recognize a negligence-based wrongful-imprisonment theory. As defendants correctly argue, a false imprisonment claim is based on the defendant's *intent* to imprison the claimant. See *Hiber v. Creditors Collection Service*, 154 Or.App. 408, 413, 961 P.2d 898 (1998). Thus, defendants argue, summary judgment must be entered against that claim. Plaintiff does not respond with any contrary authority to support his negligence-based imprisonment claim. The court, therefore, grants summary judgment on plaintiff's imprisonment claim.[4]

■ Plaintiff points to no evidence supporting his other negligence claim, based on the county's alleged negligence in hiring and supervising plaintiff. The record, instead, shows that the county reasonably trained and supervised Candilora. In addition the county acted responsibly in response to plaintiff's citizen complaint, as it immediately investigated the alleged incident. The court grants summary judgment as to plaintiff's negligence claim.

■ The court also grants summary judgment against plaintiff's claim for intentional infliction of emotional distress. Defendants' briefing argues that the alleged conduct, taken in this case by a uniformed police officer, even if true, did not constitute "an extraordinary transgression of the bounds of socially tolerable

---

**3.** In light of this holding, the court need not at this time consider separately plaintiff's allegation that Candilora used excessive force. Plaintiff's excessive-force argument is intertwined with his other arguments meant to show that his detention violated the Fourth Amendment. Because the court finds material fact issues precluding summary judgment on the Fourth Amendment claim, for purposes of resolving the parties' summary judgment motions, the court declines to resolve the issue of the alleged use of excessive force.

**4.** Plaintiff does suggest in his response that he should be allowed to amend his complaint to state an intent-based imprisonment claim. Given that the parties have finished briefing on their summary judgment motions and plaintiff has not filed a motion to amend his complaint explaining why he should be permitted to do so, the court denies any request to amend.

conduct," as Oregon law requires to state such a claim. *Hall v. The May Dep't Stores,* 292 Or. 131, 137, 637 P.2d 126 (1981), *abrogated on other grounds by, McGanty v. Staudenraus,* 321 Or. 532, 543, 901 P.2d 841 (1995). Plaintiff made no effort in his response to show support for his emotional-distress claim. As a result, there is no indication from plaintiff that, for example, he actually suffered severe emotional distress. See *Checkley v. Boyd,* 170 Or.App. 721, 726, 14 P.3d 81 (2000) (observing that to state an intentional-infliction-of-emotional-distress claim one must show "the defendant did in fact cause the plaintiff emotional distress that was severe"). Given plaintiff's complete failure to respond, the court grants summary judgment as to this claim as well.

## VI. CONCLUSION

For the foregoing reasons, the court DENIES plaintiff's motion for partial summary judgment. (Doc. # 24). The court DENIES in part and GRANTS in part defendants' motion for summary judgment. (Doc. # 17). Specifically, the court denies summary judgment as to plaintiff's Fourth Amendment claim, but grants summary judgment as to his municipal-liability claim and state law claims.

IT IS SO ORDERED.