Argued and submitted December 3, 2003, judgment on plaintiff's claim for intentional infliction of emotional distress reversed and remanded; otherwise affirmed March 2, petition for review denied June 1, 2005 (338 Or 583)

Ronald H. CHECKLEY,
individually,
*Appellant,*
*and*

Ronald H. CHECKLEY,
as Guardian Ad Litem for Shad Alan Wagner;
and Lon A. Bryant,
as Guardian Ad Litem for Shad Alan Wagner,
*Plaintiffs,*

*v.*

James Timothy BOYD,
personal representative of the Estate of
Charles Boyd, deceased;
Bimla Boyd;
and Keizer Congregation of
Jehovah's Witnesses, Salem, Oregon,
an Oregon not for profit corporation,
*Respondents.*

95C-12611; A117996

107 P3d 651

Kelly W. G. Clark argued the cause for appellant. With him on the briefs were Kristian Roggendorf and O'Donnell & Clark LLP.

Richard L. King argued the cause for respondents James Timothy Boyd and Bimla Boyd. With him on the brief was Warren Allen King O'Hara Bennett Jepsen & Diamond, LLP.

Kim E. Hoyt argued the cause for respondent Keizer Congregation of Jehovah's Witnesses, Salem, Oregon. On the brief were John Pollino and Garrett, Hemann, Robertson, Paulus, Jennings & Comstock, P.C.

Before Haselton, Presiding Judge, and Linder and Ortega, Judges.

LINDER, J.

**LINDER, J.**

In this appeal, plaintiff challenges the trial court's grant of summary judgment to defendants on plaintiff's claims for intentional infliction of emotional distress (IIED), wrongful use of a civil proceeding, and vicarious liability of the Keizer Congregation of Jehovah's Witnesses (the "Congregation") for the acts of defendants Charles and Bimla Boyd (the Boyds).[1] We conclude that the trial court correctly granted summary judgment on the wrongful use and vicarious liability claims, but erred in granting summary judgment on plaintiff's IIED claim. We also conclude that the trial court erred in ruling that audiotaped conversations between plaintiff's brother and the Boyds are inadmissible.

This case is before us for a second time. In the first appeal, we reversed the trial court's dismissal of plaintiff's claims on the pleadings and remanded for further proceedings. *See Checkley v. Boyd*, 170 Or App 721, 14 P3d 81 (2000), *rev den*, 332 Or 239 (2001) (*Checkley I*). We briefly discuss the procedural history of the case from its inception, because that background aids in understanding the posture of the issues in this second appeal.

Plaintiff was guardian and conservator for his disabled brother, Shad Wagner (Wagner). Plaintiff brought this action alleging claims—on his own behalf as well as on behalf of Wagner—premised on allegations that the Boyds, while acting under the direction and control of the Congregation, destroyed the relationship between the brothers. In particular, plaintiff alleged that the Boyds manipulated and coerced Wagner into believing that plaintiff stole money from Wagner and dealt dishonestly in handling Wagner's finances; that plaintiff physically and emotionally abused and neglected Wagner; that plaintiff was holding Wagner prisoner; and that plaintiff was an instrument of Satan or was Satan. According to the allegations, the Boyds' manipulation of Wagner caused him to bring a guardianship proceeding to have plaintiff removed as Wagner's conservator and guardian, which the probate court declined to do. Based on those

---

[1] Charles Boyd is now deceased. James Timothy Boyd, personal representative of Charles Boyd's estate, has been substituted for him as a defendant.

and related allegations, plaintiff asserted claims against the Boyds on behalf of himself and Wagner for IIED and wrongful use of a civil proceeding. Plaintiff also asserted, on behalf of himself and Wagner, that the Congregation was vicariously liable for the Boyds' conduct because the Boyds were agents of the Congregation acting under its direction and control.

When the case was first before the trial court, defendants moved to dismiss the claims that plaintiff brought on his own behalf on the ground that the allegations of his complaint failed to state a claim. *See* ORCP 21 A(8). The trial court agreed and granted the motion as to all of plaintiff's claims. The claims that plaintiff brought on Wagner's behalf, as his guardian (Wagner's claims), proceeded to a jury trial. At the close of plaintiff's evidence, the trial court granted defendants' motion for directed verdict on those claims. Plaintiff appealed, challenging both the dismissal of his own claims and the directed verdict on Wagner's claims. In *Checkley I*, we affirmed the directed verdict on Wagner's claims but reversed the dismissal of plaintiff's claims and remanded for further proceedings. *Checkley I*, 170 Or App at 744.

On remand, defendants moved for summary judgment on all of plaintiff's claims, arguing that there were no disputes of material fact and that defendants were entitled to judgment as a matter of law. *See* ORCP 47 C. The parties agreed that, in ruling on the motion, the trial court could consider the voluminous transcript from the previous trial of Wagner's claims, together with supplemental affidavits and depositions that the parties submitted for the summary judgment record on remand. Thus, many of the relevant facts for summary judgment were developed at the previous trial and were set out in our opinion in *Checkley I*. Although we supplement those facts in our later discussion, for present purposes, we borrow the description of the facts from *Checkley I*:[2]

_____

[2] The summary of facts is taken from the portion of the opinion reviewing the directed verdict ruling in the trial of Wagner's claims. The standard of review in *Checkley I* that applied to our review in that regard required us, as does the standard of review in this case, to view the record in the light most favorable to plaintiff. *See Mauri v. Smith*, 324 Or 476, 479, 929 P2d 307 (1996) (in reviewing directed

"Plaintiff's brother, Wagner, has been a devoted member of the Jehovah's Witness faith since the late 1970s. He developed that interest through his mother, who was also a Jehovah's Witness, and Wagner continued to pursue that interest after plaintiff became his guardian in 1981. In the early 1990s, Wagner met the Boyds through the Congregation, where Mr. Boyd served as an elder. The Boyds drove Wagner to Congregation meetings, took him on outings with their family, and regularly spoke with him on the telephone. In 1993, the relationship between Wagner and plaintiff began to deteriorate. Wagner appeared more 'withdrawn' around and 'less interested' in his brother and other family members. The two brothers also began to argue about the extent to which Wagner should be involved in the Congregation. For example, Wagner wanted to become involved in the Congregation's door-to-door proselytizing activities. Plaintiff, citing concerns for Wagner's safety, would not allow Wagner to participate.

"The tension between the brothers escalated in February 1994, when Wagner complained to a state Disability Services caseworker that plaintiff was not properly caring for him. The Boyds drove Wagner to that meeting, introduced him to the caseworker, and participated in the discussion. Wagner explained that he wanted his 'competency' restored and provided a list of grievances. Those grievances included concerns about the infrequency of bathing, the lack of vegetables in his diet, and the poor quality of his clothing. Wagner also requested that he be allowed to attend more meetings and to associate more frequently with members of the Congregation. The next day, the disability caseworker visited the brothers' home and met with plaintiff. The caseworker observed that Wagner had plenty of adequate clothing and an ample supply of fruits and vegetables. Plaintiff acknowledged, however, that his back problems prevented him from bathing Wagner more than once a week. The caseworker found no evidence of physical or emotional abuse. When the caseworker discussed with Wagner the inaccuracies of his allegations, Wagner admitted that he had 'forgotten these things' and emphasized that his main complaint was that he wanted to spend more time with other Jehovah's Witnesses.

---

verdict, the court considers the evidence in the light most favorable to the party against whom the verdict was entered); *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997) (in reviewing summary judgment ruling, the record is viewed in the light most favorable to the nonmoving party).

"After that meeting, plaintiff consulted with an attorney and, as a result, decided not to allow Wagner to associate with the Boyds anymore. Plaintiff prohibited Wagner from visiting the Boyds and significantly reduced the number of meetings that Wagner could attend. The day after meeting with plaintiff, his attorney sent 'cease and desist' letters to the Boyds and to the Congregation. Plaintiff's attorney accused defendants of interfering with the guardian/ward relationship by encouraging Wagner 'to live with them,' by hiring an attorney 'to sever the relationship * * * in favor of themselves,' and by fabricating 'false reports' of abuse and neglect. Plaintiff's attorney also demanded that the Boyds 'cease and desist' from further contact with Wagner. Despite receiving the letter, the Boyds continued to talk with Wagner by telephone and arranged for Wagner to consult with an attorney. They drove him to the attorney's office for the appointment and participated, to some extent, in that meeting. Mrs. Boyd maintained telephone contact with Wagner's attorney.

"Some months later, Wagner's attorney filed a petition to have plaintiff removed as conservator and guardian and to appoint a successor. Plaintiff testified that Wagner vacillated on his decision to pursue plaintiff's removal as guardian and conservator but that, whenever he expressed doubts, he would discuss the matter with someone from the Congregation, who would encourage him to proceed. Wagner ultimately followed through with the removal petition. After an exhaustive accounting, investigation, and hearing, the probate court declined to remove plaintiff as Wagner's guardian and conservator. Instead, the court imposed guidelines for resolving disputes between the brothers and instructed plaintiff to allow Wagner to worship with a different congregation. Following the proceeding, plaintiff concluded that his relationship with Wagner had been irreparably damaged. He therefore sold the house in which he and Wagner had lived together, placed Wagner in an adult foster care facility, and brought this action against defendants."

*Id.* at 738-40 (ellipsis in original).

On remand, in moving for summary judgment, defendants challenged the existence of a triable issue of fact on several, and in some instances all, of the elements of each of plaintiff's claims. The trial court agreed that defendants

were entitled to judgment on all claims as a matter of law and thus granted summary judgment on the claims against the Boyds for IIED and wrongful initiation of a civil proceeding, as well as on the related claims asserting the Congregation's vicarious liability for the Boyds' conduct. The trial court also reaffirmed an earlier ruling, made before the first appeal, that audiotapes that plaintiff made of telephone conversations between Wagner and the Boyds were inadmissible. On appeal, plaintiff challenges that evidentiary ruling, as well as the grant of summary judgment on all of his claims. Because plaintiff relies, in part, on the contents of the audiotapes to show that there are genuine issues of fact as to all of his claims, we begin by addressing their admissibility. We then address plaintiff's challenges to the trial court's grant of summary judgment on each of plaintiff's claims.

## I. THE ADMISSIBILITY OF THE AUDIOTAPES

### A. *Analysis Under Oregon's Wiretap Law*

■ The challenged audiotapes consist of telephone conversations between Wagner and the Boyds that plaintiff recorded while Wagner resided with him. By motion *in limine*, defendants challenged the admissibility of the audiotapes, arguing that, because Wagner did not consent[3] to having the conversations recorded, use of the audiotapes as evidence violated state and federal wiretap laws, as well as OEC 403. The trial court summarily allowed the motion, without specifying the grounds for its decision. As do the parties in their arguments on appeal, we therefore consider each of the potential grounds on which the trial court may have ruled.[4]

ORS 165.540 (1995) is Oregon's wiretap law.[5] Substantively, as well as structurally, the statute consists of two

---

[3] Wagner's lack of consent is not in dispute.

[4] As a threshold matter, defendants urge that we resolved the admissibility of the audiotapes in *Checkley I* and that our first decision is binding on that point. They are wrong. We declined to reach the question because we concluded that, even if the audiotapes were admissible, their exclusion was harmless as to Wagner's claims. *See Checkley I*, 170 Or at 744 (concluding that "none of the excluded evidence would have added anything of significance to demonstrate that Wagner's emotional distress was severe enough to support an IIED claim").

[5] The statute was amended in 2001 and 2003 in ways that do not affect the analysis in this case. *See* Or Laws 2001, ch 104, § 54; Or Laws 2001, ch 385, § 4;

types of provisions: (1) prohibitions on certain activities involving the interception of communications and (2) exemptions from those prohibitions for specified persons and activities. As pertinent here, paragraphs (1)(a) and (c) prohibit obtaining or attempting to obtain a telephone conversation using mechanical or electrical means without the consent of one or more of the participants.[6] Paragraph (1)(e) further prohibits the "[u]se or attempt to use, or divulge to others any conversation, telecommunication or radio communication obtained by any means prohibited by this section." Thus, a person may neither record a telephone conversation without the consent of at least one of the participants nor use or divulge a conversation so recorded. Doing either is a misdemeanor offense. ORS 165.540(9). ORS 41.910(1)(a) complements the wiretap prohibitions by providing that "[e]vidence of the contents of any wire or oral communication intercepted * * * [i]n violation of ORS 165.540 shall not be admissible in any court of this state, except as evidence of unlawful interception."

As noted, however, the wiretap law exempts certain persons and activities from its prohibitions. Among the exemptions set forth in the statute is one for recordings made of telephone conversations when people are in their own homes. Specifically, ORS 165.540(3) provides:

"The prohibitions in subsection (1)(a), (b), or (c) of this section shall not apply to subscribers or members of their

---

Or Laws 2003, ch 14, § 62. All references, therefore, are to the 1995 version in effect when the trial court considered defendants' motion *in limine*.

[6] Those paragraphs of ORS 165.540(1) provide:

"Except as otherwise provided in * * * subsections (2) to (7) of this section, no person shall:

"(a) Obtain or attempt to obtain the whole or any part of a telecommunication or a radio communication to which such person is not a participant, by means of any device, contrivance, machine or apparatus, whether electrical, mechanical, manual or otherwise, unless consent is given by at least one participant.

"* * * * *

"(c) Obtain or attempt to obtain the whole or any part of a conversation by means of any device, contrivance, machine or apparatus, whether electrical, mechanical, manual or otherwise, if all participants in the conversation are not specifically informed that their conversation is being obtained."

family who perform the acts prohibited in subsection (1) of this section in their homes."

Here, plaintiff recorded the telephone conversations between Wagner and the Boyds while in his home. Thus, plaintiff's conduct was not prohibited by paragraphs (1)(a) and (c), which, but for the "homeowner" exemption,[7] would have made it unlawful for him to record those telephone conversations without Wagner's consent.

Defendants agree that the "homeowner" exemption of subsection (3) applies here. They disagree, however, as to the scope of the exemption. In particular, they assert that *obtaining* or recording a telephone conversation is not prohibited but that *any use* of a conversation so recorded is. Defendants point to the fact that the "homeowner" exemption cross-references only paragraphs (1)(a) through (c), which prohibit "obtaining" conversations through recorded means, not paragraph (1)(e), which prohibits "use" of the a conversation so obtained.

The problem with defendants' argument is that the express text of paragraph (1)(e) renders a cross-reference to it unnecessary. Paragraph (1)(e), by its terms, prohibits the use of a conversation or telecommunication "obtained by *any means prohibited* by this section." Thus, the use prohibition does not apply unless the conversation or telecommunication was obtained in violation of the other provisions of subsection (1). Here, as defendants agree, because of the "homeowner" exemption of subsection (3), plaintiff lawfully obtained—that is, recorded—the conversations between Wagner and the Boyds. Necessarily, then, the use of the conversations so obtained is not prohibited by the terms of paragraph (1)(e).

Despite that plain language, defendants urge that context compels a different conclusion. Specifically, defendants rely on the exemption in subsection (8) of the wiretap law for individuals who record transmissions from amateur

---

[7] We use the term "homeowner" exemption solely as a convenient shorthand for a recording made in a home, by either the subscriber to the telephone service or a member of the subscriber's family. We recognize that the statute does not require that the person be a homeowner, as opposed to someone who rents or leases a residence. Nor does the statute require the person to be the one who owns, leases, or rents the residence.

and citizens band radio and certain government communications.[8] In that provision, the legislature expressly cross-referenced paragraph (1)(e)—the use prohibition—as well as paragraphs (1)(a) and (c). According to defendants, that provision demonstrates that, had the legislature wanted the "homeowner" exemption to extend to use of a conversation or telecommunication obtained in the home, the legislature would have expressed that intent by cross-referencing paragraph (1)(e).

There are two problems with defendants' reliance on subsection (8), however. First, subsection (8) was added to the statute 34 years after the "homeowner" exemption of subsection (3), which was part of the statute when it was first enacted in 1955. *See* Or Laws 1955, ch 675 (original version of wiretap statute); Or Laws 1989, ch 983, § 14a (adding exemption later codified as ORS 165.540(8)). Because of that later-enacted status, subsection (8) is not context for interpreting the "homeowner" exemption. *See Wiard Memorial Park Dist. v. Wiard Community Pool*, 183 Or App 448, 454 n 5, 52 P3d 1080, *rev den*, 335 Or 114 (2002) (later-enacted portions of a statute are not context for earlier-enacted portions).

Second, even though subsection (8) contains a cross-reference to the use prohibition in paragraph (1)(e), the fact remains that the terms of paragraph (1)(e) are plain and unequivocal—they prohibit use of a conversation or telecommunication only when it was *obtained* by a *prohibited means*. Defendant's reliance on subsection (8) does nothing to overcome the clarity of that language. The additional cross-reference to paragraph (1)(e) in subsection (8) at most suggests that the legislature said more than it had to; it provides no basis to conclude that the legislature—in prohibiting the use of a recorded conversation only when it is obtained by a

---

[8] ORS 165.540(8) provides:

"The prohibitions in subsection (1)(a), (c), (d) and (e) of this section do not apply to any:

"(a) Radio communication which is transmitted by a station operating on an authorized frequency within the amateur or citizens bands; or

"(b) Person who intercepts a radio communication which is transmitted by any governmental, law enforcement, civil defense or public safety communications system, including police and fire, readily accessible to the general public provided that the interception is not for purposes of illegal activity."

"prohibited means"—did not mean what it said in paragraph (1)(e). *See generally State v. Stamper*, 197 Or App 413, 427, 106 P3d 172 (2005) (a conclusion that the legislature said more than it needed to in one statute is far less offensive to legislative prerogative than holding that the legislature did not mean what it said in another statute).[9]

We therefore conclude that plaintiff's conduct in recording Wagner's telephone conversations did not violate ORS 165.540(1)(a) and (c). Because that conduct was lawful, plaintiff is not prohibited by ORS 165.540(1)(e) from using the audiotape recordings. Likewise, because plaintiff intercepted the recordings lawfully, they are not inadmissible under ORS 41.910(1).

B. *Analysis Under the Federal Wiretap Act*

■ The parties next debate the second possible basis for the trial court's exclusion of the tapes: the federal Wiretap Act, 18 USC sections 2510 to 2522. Defendants argue that, unlike ORS 165.540, the federal Wiretap Act "contains no exception permitting family members to tape-record private telephone conversations made by other family members." But we held otherwise in *State v. Capell*, 156 Or App 582, 586, 966 P2d 232 (1998), *rev den*, 328 Or 418 (1999). That case involved a mother who recorded her teenage son's telephone conversation. In concluding that the mother's conduct did not violate the federal Wiretap Act, we examined the federal act's legislative history and purpose, as well as federal court interpretations of the act, which indicated that Congress "did not intend to regulate the use of a personal telephone system that is tantamount to overhearing a conversation on one's phone in one's residence." *Id.* at 585 (citation omitted). We agreed with federal courts that had held that "the recording of conversations by a parent in the interest of a son's well-being simply is not the kind of concern that Congress had * * *." *Id.* at 586.

---

[9] We note, moreover, that the limitation that defendants would place on "use" of lawfully obtained conversations would all but nullify the "homeowner" exemption. Under defendants' interpretation of the exemption, a parent could, for example, intercept a teenager's phone calls that reveal the teenager's drug use, but the parent could not then confront the teenager with that information, place the teenager in counseling, or otherwise "use" the intercepted conversations. There would be little, if any, point to the "homeowner" exemption if defendants were correct.

Our holding in *Capell* applies equally here. Plaintiff's relationship as guardian and conservator for Wagner is analogous to the relationship of a parent to his or her child. Although Wagner is an adult, he suffered disabling injuries from a car accident in 1975, when he was 22. The injuries left him with diminished eyesight, partial paralysis on one side of his body, severe difficulties in walking, and significant brain damage, including difficulties with abstract reasoning and social judgment. Cognitively, Wagner functions at the level of a young child, perhaps as young as a six-year-old. As a result of his brain damage, Wagner is highly vulnerable to suggestion. After the accident, Wagner's mother was appointed his guardian and conservator. When she died in 1981, plaintiff, Wagner's brother and sole living family member, was appointed to that role. In that capacity, plaintiff had many if not all of the same legal responsibilities of care and supervision that characterize a parent's responsibilities to a child. *See generally* ORS 125.315.[10] In recording Wagner's conversations with the Boyds, plaintiff's conduct involved the use of his personal telephone system to overhear conversations in his residence between his disabled ward and persons outside the family who may have been trying to unduly influence that ward. Under the circumstances, plaintiff's conduct falls well within the rationale of our holding in *Capell* and was not unlawful under the federal Wiretap Act. The audiotapes were not inadmissible on that ground.

## C. *Analysis Under OEC 403*

■■ That leaves, then, the final ground on which defendants sought to exclude the audiotapes—OEC 403, which provides:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

---

[10] For example, a guardian has legal custody of the ward and is responsible for establishing where the ward will reside (ORS 125.315(1)(a)); a guardian must provide for the "care, comfort and maintenance" of the ward, including the ward's education and training (ORS 125.315(1)(b)); and a guardian is responsible for the ward's health care decisions (ORS 125.315(1)(c)).

Under OEC 403, a trial court must balance the prejudicial effect of admitting the evidence against its probative value. *McCathern v. Toyota Motor Corp.*, 332 Or 59, 71-72, 23 P3d 320 (2001). In making the risk-benefit analysis under OEC 403, the trial court must consider the proffering party's need for the evidence, the strength of the evidence, the quantum of probative value of the evidence, the risk of unfair prejudice, the time required to present the evidence, and whether the evidence would distract the jury. *State v. Hampton*, 317 Or 251, 259-60, 855 P2d 621 (1993). We review for legal error whether a trial court followed the procedure specified by "OEC 403 by balancing the cost [of admission of relevant evidence] in terms of [the] prejudice of the evidence against its benefits." *McCathern*, 332 Or at 71-72 (citation omitted). If the trial court followed the procedure specified by OEC 403, we review its decision to exclude relevant evidence for abuse of discretion. *Id.* at 71.

■　　In arguing that the trial court properly exercised its discretion under OEC 403, defendants urge that admitting the audiotapes, either in full or in part, would have been fraught with the potential for collateral disputes over other evidentiary issues, such as relevance and hearsay. Defendants also point to the fact that plaintiff has 144 hours of audiotaped conversations, which they assert is an unmanageable volume to place before a jury; yet, according to defendants, submitting excerpts of conversations could prove misleading. Defendants therefore urge that, on balance, the trial court properly exercised its discretion under OEC 403 to exclude the audiotapes in their entirety.

　　The problem with defendants' argument, however, is that the trial court's ruling provides no indication that the trial court, based on defendants' concerns or any others, engaged in the "conscious process of balancing the costs of the evidence against its benefits" that OEC 403 requires. *State v. Pinnell*, 311 Or 98, 112, 806 P2d 110 (1991) (citation omitted). As earlier noted, the trial court's order was summary and did not identify whether it was based on the state wiretap law, the federal wiretap law, OEC 403, or some combination of the three grounds. In the absence of findings to support a ruling under OEC 403, we cannot determine that the trial court made an OEC 403 risk-benefit analysis. Nor is it

our role to "speculate about how the trial court could have exercised its discretion under OEC 403 if it had chosen to do so." *State v. Davis*, 336 Or 19, 27, 77 P3d 1111 (2003) (citation omitted). Consequently, on the record before us, *if* the trial court excluded the audiotapes under OEC 403, that exclusion was error because the trial court did not follow the procedure that OEC 403 requires. As we later discuss, the case must be remanded for further proceedings on plaintiff's IIED claim, and the audiotapes provide evidence relevant to that claim. It therefore remains for the trial court to engage in the necessary balancing under OEC 403, if defendants renew their OEC 403 challenge to the admissibility of the audiotapes. *See State v. Hardman*, 196 Or App 522, 533, 102 P3d 722 (2004) (error to exclude evidence where OEC 403 balancing was not correctly performed; on remand, the trial court directed to apply the OEC 403 balancing test).

With that predicate challenge to the trial court's evidentiary ruling resolved, we turn to the trial court's grant of summary judgment on each of plaintiff's claims against the Boyds and the Congregation.

## II. THE SUMMARY JUDGMENT RULINGS

### A. *Summary Judgment in Favor of the Boyds on IIED*

Plaintiff first challenges the trial court's grant of summary judgment on plaintiff's IIED claim against the Boyds. That claim requires plaintiff to prove three elements: (1) that defendants intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such distress; (2) that defendants engaged in outrageous conduct—*i.e.*, conduct extraordinarily beyond the bounds of socially tolerable behavior; and (3) that defendants' conduct in fact caused plaintiff severe emotional distress. *McGanty v. Staudenraus*, 321 Or 532, 543, 550, 901 P2d 841 (1995) (citation omitted). Defendants' summary judgment motion challenged the existence of a triable issue of fact on two of those elements, arguing that no reasonable

juror could find that the Boyds' conduct was "outrageous" or that plaintiff suffered severe emotional distress.[11]

■ Outrageous conduct is conduct that is "an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty*, 321 Or at 543 (citation omitted). As we explained in *Checkley I*, "a defendant's publication of a defamatory or otherwise significantly stigmatizing statement, knowing the statement to be false, unfounded, or unsubstantiated, is conduct that, if found to be true by a factfinder, constitutes an extraordinary transgression of what is socially tolerable." *Checkley I*, 170 Or App at 727. The fact that the defamation served an ulterior purpose or took advantage of an unusually vulnerable individual can add to its socially outrageous quality. *Id.*

■ Here, plaintiff urges that the evidence provides an ample basis from which a factfinder could find that the Boyds, knowing of Wagner's unusual suggestibility, made statements to Wagner that defamed plaintiff and that the Boyds knew were unsubstantiated. Plaintiff relies on evidence from the trial transcript that the Boyds were aware of Wagner's vulnerability due to his disability; that they tried to convince Wagner that plaintiff was neglecting him and misappropriating his money, when in fact plaintiff was not; and that they manipulated and coerced Wagner into pursuing a guardianship proceeding designed to remove plaintiff as Wagner's guardian, which proved meritless for that purpose. As we observed in *Checkley I*, at which stage we were concerned only with whether the parallel allegations of the complaint stated a claim, such conduct, if established to a jury's

---

[11] On appeal, defendants also argue that, as a matter of law, the intent element is not satisfied. It is unclear whether that argument is properly preserved. Defendants did not raise it until their reply to plaintiff's response to the motion for summary judgment. In all events, we have no difficulty rejecting defendants' argument that the only finding a jury could make on this record is that the Boyds were motivated by an intent to help Wagner, whom they believed plaintiff was abusing and neglecting. As we describe later in discussing the "outrageousness" element of the offense, a jury could take a much less benign view of the Boyds' conduct and, inferentially, their intent. Whether the Boyds engaged in the allegedly outrageous conduct with intent to cause plaintiff severe emotional distress, or with knowledge that it was substantially certain that plaintiff would experience such distress, presents a quintessential question for a jury to resolve.

satisfaction, "falls within the bounds of what we and the [Oregon] Supreme Court consistently have concluded satisfies the 'outrageousness' element of IIED." 170 Or App at 728. Whether plaintiff could produce evidence that supported those allegations remained, at the time of the first appeal, to be seen.

We now conclude that the summary judgment record, viewed most favorably to plaintiff, gives rise to triable issues of fact on the element of outrageousness. That is so based on the transcript of the original trial, even without the audiotape recordings on which plaintiff relies. From the testimony in the original trial, a jury could find that the Boyds were aware of Wagner's disability, including his cognitive limitations and suggestibility. In particular, the record permits a finding that Wagner, due to cognitive limitations caused by his severe brain injury years before, is easily led, easily influenced, and easily made to say or think whatever someone wants him to say or think. A jury could infer that Wagner's vulnerability would be obvious to anyone interacting with him, especially the Boyds, who had significant and ongoing contacts with Wagner. In addition, the record establishes that the Boyds had reviewed the court order that appointed plaintiff to be Wagner's conservator and guardian based on Wagner's lack of competency. Indeed, the Boyds provided copies of that court order to the caseworker who interviewed Wagner after, as earlier described, the Boyds took Wagner to Disability Services to complain that plaintiff was neglecting him.

A jury could also infer on this record that the Boyds were instrumental in causing Wagner to seek an investigation into the adequacy of plaintiff's care of Wagner and to remove plaintiff as his guardian. In talking to the disability caseworker, the Boyds portrayed plaintiff as insensitive, not meeting Wagner's needs, and as a "bad guy" who, to the extent he had recently done better in caring for Wagner, was doing so "just for looks." The Boyds maintained that plaintiff was trying to make Wagner seem less functional than he was. A jury could find, however, that Wagner was severely limited in his cognitive abilities and those limitations were apparent to anyone—including the Boyds—who dealt with

him. There is evidence that the Boyds encouraged Wagner to lie to plaintiff, which created more conflict for Wagner, who was ordinarily a very honest individual. Also, the record provides evidence that Wagner's cognitive impairment is such that he has a limited ability to initiate change and to sustain any motivation to do so. From that, a jury could infer that it was the Boyds, not Wagner, who were really pressing the complaints about plaintiff's care and that the Boyds provided the motivation for Wagner to pursue the guardianship proceeding.

The outcome of the disability caseworker's investigation and the guardianship proceeding provides a basis for a jury to conclude that the Boyds, in pressing Wagner to pursue those allegations, were deliberately defaming plaintiff, either in an effort to turn Wagner against plaintiff—his only living family member—or with indifference to that consequence. The caseworker found no significant deficiencies in the food, clothing, living environment, or other aspects of the home that plaintiff provided for Wagner. Testimony by others portrayed plaintiff as a caring and conscientious brother and caretaker. Indeed, according to the caseworker, the Boyds were aware that Wagner was fond of plaintiff and that Wagner's charges that he was being neglected created tension in their relationship. A jury could conclude that the Boyds' persistence, in light of the unfounded allegations of neglect and the destruction to Wagner personally and to his relationship with his guardian and only living family member, was outrageous conduct.

The jury could also find outrageous conduct based on the evidence pertaining to the outcome of the proceeding brought to remove plaintiff as guardian. The probate judge expressly found that plaintiff and Wagner had a good relationship until 18 months before the proceeding; that plaintiff "is and has been genuinely concerned about [Wagner's] best interest, both now and over the 20 years since" Wagner's accident; that the conflict and tension between plaintiff and Wagner was due to the influence of certain members of the Congregation, not the tenets of Wagner's faith; that the guardianship proceeding would not have occurred without the encouragement of those members of the Congregation;

and that the guardianship proceedings had been very damaging to plaintiff and Wagner's relationship, but not irreparably so. The probate judge did not, either in her letter opinion, her order, or her trial testimony, identify the Boyds as the Congregation members who had influenced Wagner. But in the context of the evidence as a whole, a jury could readily infer that the probate judge was referring to them. As we later describe, the probate court awarded some relief on the guardianship petition. But the probate court declined to remove plaintiff as guardian and specifically gave plaintiff the ability to require Wagner to worship at another Jehovah's Witnesses church and to restrict Wagner's interaction with any individual in the church that plaintiff, in good faith, believed was damaging their relationship.

Defendants do not dispute the existence of that evidence in the summary judgment record. They contend only that, from it, a jury could not conclude that the Boyds were deliberately defaming plaintiff, rather than trying in good faith to assist Wagner to address his complaints and concerns about the quality of plaintiff's care. We disagree. Although the inferences from the record as a whole may be competing, the evidence viewed most favorably to plaintiff permits a factual conclusion that the Boyds' defamation of plaintiff was deliberate; that the Boyds pressed Wagner to move forward on the guardianship proceeding despite the fact that the caseworker's investigation refuted any significant concerns; that the Boyds did so knowing of Wagner's extreme suggestibility; and that they were indifferent to the internal conflict that those actions created for Wagner and to the effect on plaintiff and Wagner's relationship, or possibly even intended to subvert that relationship. Such inferences, if a jury were to choose to draw them, would support a finding that the Boyds' conduct was outrageous.

The audiotapes provide further support for such a finding on a jury's part.[12] Viewing the evidence provided by

_____

[12] For purposes of the trial court's review of the audiotapes, plaintiff prepared a single audiotape of 90 minutes that excerpted some of the conversations from the 144 hours of audiotapes that exist. Plaintiff also had those excerpted conversations transcribed. Our description of the contents of the audiotapes is based on a review of that transcript.

the audiotapes in the light most favorable to plaintiff, a jury reasonably could find, among other conclusions, that:

- Mrs. Boyd pressed Wagner to pursue a guardianship proceeding through his attorney when Wagner seemed to lack motivation to do so, often telling Wagner what to say to his attorney;

- Mrs. Boyd was so proactive as to try (albeit unsuccessfully) to meet personally with Wagner's attorney, without Wagner present and without his advance knowledge or approval, to press the attorney to move forward on the guardianship proceeding;

- When Wagner decided he was wrong in thinking that plaintiff had neglected his needs, Mrs. Boyd insisted that he was not and persuaded him otherwise;

- When Wagner tried to convince Mrs. Boyd that plaintiff was careful with Wagner's financial resources and had receipts for what plaintiff spent on Wagner's behalf, Mrs. Boyd insisted otherwise, without any apparent basis for knowing otherwise, and maintained that plaintiff mismanaged and pilfered Wagner's money;

- Mrs. Boyd, contrary to all evidence and experience, tried to convince Wagner that he had a normal IQ and that plaintiff wanted Wagner to be "mentally retarded" and obtained that diagnosis through a biased doctor;

- Mrs. Boyd told Wagner repeatedly, in the context of conversations in which she tried to persuade him to maintain resolve to pursue the change of guardianship, that plaintiff was "Satan" and under the influence of Satan.

As our earlier discussion acknowledges, the eventual admissibility of the audiotapes may depend on resolution of any OEC 403 objection made to them on remand. But if they are determined to be admissible, the audiotapes provide a further basis from which to conclude that there are triable issues of fact on the outrageousness element of plaintiff's IIED claim against the Boyds.[13]

---

[13] The Boyds, but not the Congregation, further argue on appeal that some of the evidence in the tapes is religious in nature, as a matter of law, and therefore privileged and inadmissible. In particular, they point to evidence that the Boyds told Wagner that plaintiff is Satan or under Satan's influence and suggested to Wagner that his salvation was jeopardized by living with plaintiff. The Boyds raised the same objection in *Checkley I. See Checkley I*, 170 Or App at 728-29.

We similarly conclude that plaintiff's evidence creates a fact question on whether he suffered severe emotional distress as a result of charges that he neglected Wagner and the pursuit of the guardianship proceeding. Plaintiff's counsel presented the court with an affidavit, consistently with ORCP 47 E, stating that he had retained an expert who would testify as to plaintiff's severe emotional distress. Defendants agree that, ordinarily, such an affidavit would be sufficient to create a question of fact regarding plaintiff's emotional distress. *See Brownstein, Rask, Arenz v. Pearson,* 166 Or App 120, 125, 997 P2d 300 (2000) (affidavit may create an issue of fact merely by stating an expert has been retained and is available and willing to testify to admissible fact or opinion that would create a question of fact). Defendants assert that in this instance, however, the affidavit is contradicted by plaintiff's deposition testimony, in which plaintiff stated that his relationship with Wagner was in "pretty dire straits" before the institution of the guardianship proceedings, and that the proceedings "didn't change [the relationship] a whole lot." Also contradicting the ORCP 47 E affidavit, defendants argue, is plaintiff's testimony at trial on Wagner's claims that he was merely "pretty exhausted" and "burned out from the stress" as the result of defendants' actions, statements that defendants assert preclude a finding of severe emotional distress.

In support of their arguments, defendants rely on *Henderson-Rubio v. May Dept. Stores Co.*, 53 Or App 575, 632 P2d 1289 (1981). In *Henderson-Rubio*, we held that a party may not create a genuine issue of fact by submitting an affidavit directly contradicting his or her prior deposition testimony without any explanation for the contradiction. 53 Or

Although the procedural posture of the issue as it arises in this case differs, we conclude that the answer to their arguments is the same. Given the record as a whole, the statements made by the Boyds are "not of a kind that may only be classified as religious." *Id.* at 730. Rather, given the surrounding circumstances, which include the Boyds' other conduct and statements pertaining to what a jury could find were knowingly false defamatory statements as to plaintiff's neglect and mistreatment of Wagner, a "jury could find that the statements were made for nonreligious reasons." *Id.* Because competing conclusions reasonably can be drawn as to the religious nature of the statements, the issue is one that requires a jury's resolution, as would any other question of fact. *See Christofferson v. Church of Scientology,* 57 Or App 203, 237-38, 644 P2d 577, *rev den*, 293 Or 456 (1982), *cert den*, 459 US 1206 (1983).

App at 585. We cautioned, however, that "[n]ot all discrepancies contained in an affidavit justify a court's refusal to give credence to such evidence." *Id.* at 585 n 6 (citation omitted). Rather, the rule that *Henderson-Rubio* announced is limited to cases in which the "statements are clearly inconsistent." *Id.*

Even assuming that the same rule applies where, as here, the contradiction is between an expert's opinion and statements that a party made previously in a case, we disagree that the necessary direct and clear contradiction exists. Plaintiff's deposition testimony suggested only that the relationship between him and Wagner had begun to deteriorate before the guardianship petition was filed. In other words, that testimony merely addressed the state of the relationship between the brothers at a particular point in time. Nothing in that testimony spoke directly to plaintiff's *emotional state* as a result of defendants' actions or to the extent of any severe emotional distress. Plaintiff's deposition testimony thus was not "clearly inconsistent" with the ORCP 47 E affidavit.

Likewise, plaintiff's trial testimony is not "clearly inconsistent" with the affidavit. As plaintiff urges, there is ready explanation for the difference between his testimony and counsel's ORCP 47 E affidavit. When plaintiff gave that testimony, his IIED claim had been dismissed and he had no incentive to produce satisfactory evidence of his own emotional state or to testify in detail about it in the trial on Wagner's claims. Under those circumstances, plaintiff's testimony that he was "pretty exhausted" and "burned out from stress" is not directly inconsistent with severe emotional distress; such characterizations simply are more dilute expressions of distress, ones that fall short of the level needed for a successful IIED claim. *See Restatement (Second) of Torts* § 46 comment j (1965) (for IIED claim, distress must be so severe that no reasonable person could be expected to endure it); *Rockhill v. Pollard,* 259 Or 54, 63-64, 485 P2d 28 (1971) (for IIED claim distress must be "more than mild and transitory"). Thus, plaintiff's testimony at the original trial created no inconsistency with the ORCP 47 E affidavit that he produced on remand in connection with his personal claim for IIED.

### B. *Summary Judgment in the Boyds' Favor on Wrongful Use of a Civil Proceeding*

 In his second assignment of error, plaintiff challenges the trial court's grant of summary judgment for the Boyds on plaintiff's claim for wrongful use of a civil proceeding. To avoid summary judgment on that claim, plaintiff must present evidence establishing the existence of a jury question on five elements: (1) institution and completion of a legal proceeding; (2) termination of that proceeding in plaintiff's favor; (3) lack of probable cause to bring the proceeding; (4) malice or an improper purpose; and (5) damages. *Alvarez v. Retail Credit Ass'n*, 234 Or 255, 259-60, 381 P2d 499 (1963). We do not examine whether there are questions of fact as to each of those elements, because we conclude, as a matter of law, that the record precludes a finding that the underlying proceeding at issue—the guardianship proceeding—terminated in plaintiff's favor.

In determining whether the guardianship proceeding terminated in plaintiff's favor, we compare Wagner's petition to remove plaintiff as his guardian with the relief that the probate court ordered. The petition was entitled "Petition to Remove Guardian and Conservator; Appoint Successor Guardian and Conservator; Limit Guardianship." As that title suggests, the petition sought to remove plaintiff as Wagner's guardian and conservator. As earlier described, the probate court did not grant that relief. To the contrary, the probate court determined that a change of guardianship was not in Wagner's best interests and that the proceeding to remove plaintiff likely would not have been brought but for the influence on Wagner by certain members of the Congregation.

But plaintiff's removal as guardian was not the only relief that the petition sought. The petition also included a request that the probate court limit the guardianship by precluding the guardian from having "authority to interfere with [Wagner's] religious activities." That relief was significant to Wagner. Wagner's faith as a Jehovah's Witness is central to his identity. By the time of the probate proceeding, because the Boyds' contacts with Wagner were causing so much tension and conflict in plaintiff's and Wagner's relationship,

plaintiff had stopped permitting Wagner to attend Congregation meetings. The probate court agreed that plaintiff's guardianship should be limited to prevent that interference with Wagner's worship activities. The probate court's order therefore directed plaintiff to "allow and reasonably facilitate [Wagner's] worship and participation in activities at a Jehovah's Witnesses Church[.]" The order specified that "reasonably facilitate" included "arranging or providing transportation and providing [Wagner] with appropriate clothing, spending money, and money for donation to the church commensurate with [Wagner's] resources." The order further gave plaintiff the authority to change Wagner's place of worship to another Jehovah's Witnesses church if plaintiff, reasonably and in good faith, believed that members of the church where he was worshiping (then the Keizer Congregation) were undermining plaintiff's role as Wagner's guardian. But the order foreclosed plaintiff's authority to preclude plaintiff's worship at a Jehovah's Witnesses church altogether.

Thus, although the probate court did not rule in Wagner's favor on his primary claim for relief, *i.e.*, removal of plaintiff as Wagner's guardian and conservator, the probate court ruled at least partially in Wagner's favor on his request to limit the guardianship. Given the partial relief that the probate court ordered, the guardianship proceeding cannot be said to have terminated in plaintiff's favor. That is so as a matter of law. Thus, the trial court properly granted summary judgment in favor of the Boyds on plaintiff's claim for wrongful use of a civil proceeding.

C. *Summary Judgment on the Claims for Vicarious Liability of the Congregation*

 Finally, we address plaintiff's assignment of error that the trial court erred in granting summary judgment on plaintiff's claims against the Congregation on a theory of vicarious liability. Plaintiff pleaded that the Boyds "at all times" were acting under the direction and control of the Congregation and thus as the Congregation's agents. Consequently, plaintiff sought to hold the Congregation vicariously liable for the Boyds' conduct. On appeal, as at trial, plaintiff asserts that the Boyds were the Congregation's agents on

theories of actual authority, apparent authority, and ratification. As we explain below, however, the trial court correctly determined that plaintiff failed to present sufficient evidence to create a jury question on any of those theories.

 An agency relationship "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Rough & Ready Lumber Co. v. Blue Sky Forest Products*, 105 Or App 227, 231, 804 P2d 498 (1991) (quoting *Restatement (Second) of Agency* § 1 (1958)). Actual authority may be evidenced by express agreement or implied from the circumstances and conduct of the parties; in both circumstances, however, the principal's consent to the agency and right to control the agent are essential. *Id.*

 Apparent authority, also, turns on the conduct of the putative principal. Apparent authority "can be created only by some conduct of the principal [that], when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter. The third party must also rely on that belief." *Jones v. Nunley*, 274 Or 591, 595, 547 P2d 616 (1976) (citation omitted). In the context of this case, then, plaintiff had to present evidence from which a jury could find, based on *the Congregation's* conduct, that the Congregation consented to the Boyds acting as its agents and that it had some control over the actions that are the basis for the IIED claim.[14]

We agree with defendants that the record is devoid of any such evidence. Defendants produced affirmative evidence that there was never any discussion of the Boyds' efforts to pursue the guardianship proceeding at any Congregation meeting or meeting of its leadership. The "Presiding Overseer," who defendants acknowledge is in a church leadership position, never spoke personally with the Boyds about

---

[14] We tie our discussion to the Congregation's vicarious liability for the IIED claim against the Boyds because we have concluded that the trial court properly granted summary judgment on the wrongful use of a civil proceeding claim against the Boyds. Necessarily, then, the Congregation cannot be held vicariously liable for the Boyds' alleged tortious conduct in that regard. Plaintiff relies on the same evidence as creating a question of fact on the two vicarious liability claims.

the litigation or knew anything about it. The Boyds themselves denied that they were acting under the direction and control of the Congregation in their dealings with Wagner. The Boyds also denied that they ever talked to anyone in a leadership capacity within the Congregation about the actions they were taking to encourage Wagner to complain about plaintiff's care or to remove plaintiff as Wagner's guardian. The Boyds, instead, maintained that they were acting out of their friendship with Wagner. Plaintiff presented no evidence to the contrary, based on *the Congregation's conduct*, that adequately refutes defendants' evidence and creates a factual issue for a jury to resolve.[15]

 In addition to arguing that the Congregation is liable on an actual or apparent authority theory, plaintiff also relies on ratification, which is an independent theory of agency. Ratification requires that the principal have "knowledge of the material facts and the intent to ratify" the unauthorized acts of the purported agent. *Paragano v. Gray*, 126 Or App 670, 677, 870 P2d 837 (1994) (citations omitted). The necessary intent to ratify a purported agent's acts can be inferred from a failure to repudiate or disavow them. *Id.* at 678. But a principal's inaction or silence can provide a basis to affirm the unauthorized act of a purported agent only under " 'such circumstances that, according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent[.']" *Kneeland v. Shroyer*, 214 Or 67, 94, 328

---

[15] Plaintiff points only to evidence in the audiotapes "where the members admit to such things as calling meetings about Wagner's removal from [plaintiff's] care, discussing how the Congregation's leaders would get in touch with the national Jehovah's Witnesses organization for attorneys for Wagner, and saying the Congregation as a whole was praying for Wagner." The portions of the audiotapes that plaintiff cites contain no such evidence. Rather, they reveal a few instances in which Mrs. Boyd asserted that "elders" in the church *would* be discussing what to do to assist Wagner and that individuals in the church *would* get in touch with the national Jehovah's Witnesses organization to ask if one of its attorneys would intervene on Wagner's behalf. Mrs. Boyd said those things in the course of many other representations that she made, many of which a jury could find were factually unfounded, to encourage Wagner to continue to pursue the guardianship proceeding. No evidence establishes, however, that any of the things that Mrs. Boyd said *would* occur in fact *did* occur. Her representations about those future events—ones in which she would not have been a participant—is not competent to refute defendants' direct and unequivocal evidence that the Boyds were acting on their own in their dealings with Wagner and that the Congregation exercised no control or direction over the Boyds' conduct.

P2d 753 (1958) (quoting with approval *Restatement (First) of Agency* § 94 comment a (1933)).

In arguing that the record presents factual issues on plaintiff's ratification theory of agency, plaintiff relies on a letter that plaintiff's attorney sent to the Congregation complaining about the Boyds' and the Congregation's interference in plaintiff's relationship with Wagner and demanding that the Congregation "cease and desist" from further interference.[16] The "cease and desist" letter essentially complained to the Congregation that "members" of the Congregation—specifically and primarily, the Boyds were engaged in overreaching conduct in their relations with Wagner. The letter identified the Boyds only as members of the Congregation, not as agents acting at the Congregation's direction and control. The letter asserted some kind of "concerted effort" to undermine plaintiff's responsibilities and role as Wagner's guardian, and it threatened to seek "appropriate restraining orders" and general and punitive damages against both the Congregation and its members for acts of "further interference." Beyond demanding that the alleged interference cease and desist, the letter did not ask for a response.

Based on the Congregation's receipt of that letter, plaintiff asserts that "the Congregation knew of the [Boyds'] actions * * *, and yet did nothing to [rein] in or disavow the actions of the Boyds and other members." According to plaintiff, a jury could find that the Congregation, by not responding to the letter and by taking no action to stop the Boyds' contacts with Wagner, ratified the Boyds' actions in such a way as to make them the actions of the Congregation itself.

Were we to agree with plaintiff's ratification argument, we would stretch principles of agency ratification beyond any recognizable bounds. This is far from the typical ratification context, in which the actions of a purported agent confer a benefit on the principal that the principal accepts in silence. *See Bank of Oregon v. Hiway Products, Inc.*, 41 Or App 223, 598 P2d 318 (1979) (no ratification where unauthorized act of agent did not benefit principal). The "cease and

---

[16] The letter was sent in April 1994, a few months after the disruptive contacts between the Boyds and Wagner allegedly began. The contacts continued, and the guardianship proceeding was initiated several months after the date of the letter.

desist" letter, in effect, charged that "members" of the Congregation—the Boyds in particular—were engaged in tortious activity. The tortious activity conferred no benefit on the Congregation, nor did the letter assert that it did. Nor did the letter charge that the Boyds were acting as the Congregation's agents. Rather, the letter identified them only as "members" of the church. At most, the letter suggested some sort of "concerted activity" between the Congregation and the Boyds, thus suggesting, perhaps, that the Congregation was a joint tortfeasor.

The Congregation's failure to "rein in" the Boyds or to disavow their actions, in the face of such a letter, is not—as a matter of law—the kind of circumstance that results in agency through ratification. As a matter of the "ordinary experience and habits" of people generally, the Congregation's lack of a response to such a letter did not convey an endorsement of the Boyds' conduct or its intent to be responsible for that conduct. Were we to conclude otherwise, vicarious liability could be imposed on a putative principal who otherwise has no responsibility for tortious conduct merely by sending the putative principal a demand letter to make the third party stop, which the putative principal fails to do. We are aware of no authority that holds that a jury may find an agency relationship and impose vicarious liability in such a circumstance. We decline to be the first. The trial court's grant of summary judgment on plaintiff's vicarious liability claim against the Congregation was proper.

## III. CONCLUSION

We conclude that the trial court erred in ruling that the audiotaped telephone conversations are inadmissible under either the state or federal wiretap laws. To the extent that the trial court based its ruling on OEC 403, that ruling was also error, because the trial court did not make findings on the record or otherwise demonstrate that it engaged in the conscious balancing process that the rule requires. The trial court must do so on remand, if the objection under OEC 403 is renewed.

With regard to the trial court's summary judgment rulings, we reverse the trial court's grant of summary judgment on plaintiff's claim for IIED for the Boyds, concluding

there are factual issues for a jury's resolution on each element of the claim. We conclude, however, that the trial court properly granted summary judgment in favor of the Boyds on plaintiff's claim for wrongful use of a civil proceeding. We also conclude that the trial court properly granted summary judgment in favor of the Congregation on plaintiff's vicarious liability claims.

Judgment on plaintiff's claim for intentional infliction of emotional distress reversed and remanded; otherwise affirmed.